IN THE SUPREME COURT OF NORTH CAROLINA

No. 113A96-4

Filed 15 December 2023

STATE OF NORTH CAROLINA

v.

RUSSELL WILLIAM TUCKER

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order entered 24 August 2020 by Judge R. Stuart Albright in Superior Court, Forsyth County, denying defendant's motions for appropriate relief. Heard in the Supreme Court 8 February 2023.

*Joshua H. Stein, Attorney General, by Danielle Marquis Elder, Senior Deputy Attorney General, and Jonathan P. Babb, Special Deputy Attorney General, for the State-appellee.*

*Elizabeth Hambourger, for defendant-appellant.*

*Ian A. Mance, Quintin D. Byrd, and Irving Joyner for North Carolina Association of Black Lawyers and North Carolina State Conference of the NAACP, amici curiae.*

BERGER, Justice.

Through a series of post-conviction motions, defendant asserts that his conviction for first-degree murder and sentence of death should be set aside. Defendant argues that despite the trial court's finding that he failed to establish a prima facie case of purposeful discrimination in jury selection, he is nevertheless entitled to a new trial because newly discovered evidence, consisting of a continuing

legal education handout and a statistical study, supports his claim pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). However, defendant failed to raise a *Batson* claim or otherwise argue purposeful discrimination on direct appeal from his original trial or in previous post-conviction proceedings. Thus, the question before this Court is whether review of defendant's *Batson* claim is procedurally barred pursuant to N.C.G.S. § 15A-1419. For the reasons set forth herein, we conclude that defendant's claim is barred and affirm the judgment of the Superior Court denying defendant's motion for appropriate relief.

## I. Factual and Procedural Background

It is undisputed that defendant killed K-Mart security guard Travis Williams and shot two Winston-Salem police officers on December 8, 1994.[1] Defendant was indicted for first-degree murder and two counts of assault with a deadly weapon with intent to kill inflicting serious injury. A Forsyth County jury found defendant guilty of first-degree murder, and defendant was sentenced to death upon the jury's recommendation. The State dismissed the assault charges.

Forsyth County Assistant District Attorneys Robert Lang and David Spence prosecuted the case for the State. During jury selection, which was conducted by Mr. Lang, defendant lodged *Batson* objections to the State's peremptory strikes against

---

[1] A more detailed account of the underlying facts of this case can be found in this Court's opinion at *State v. Tucker*, 347 N.C. 235, 239–40 (1997).

black prospective jurors Debra Banner, Thomas Smalls, and Wayne Mills. The voir dire transcript reveals the following relevant exchanges between these prospective jurors, the trial court, and the State.

**A. Voir Dire of Ms. Banner**

Following inquiry by the trial court, Ms. Banner stated that she worked at Forsyth Medical Center and had not acquired sufficient leave time, which she referred to as PTO, to receive compensation when she missed work. Ms. Banner worked eight-hour shifts that ended at 11:00 p.m., and "nine o'clock [a.m. wa]s not [her] time" because she was not a morning person.[2] Ms. Banner further stated that she "prefer[red] not to be on [the jury]." The trial court clarified her response:

> THE COURT: Prefer not to serve I take it. Do you think that situation will prevent you or substantially impair you in performing your duties as a juror in this?
>
> MS. BANNER: Yes.
>
> THE COURT: Will it prevent you or substantially impair you from giving your full attention to this case?
>
> MS. BANNER: Yes, sir.

---

[2] The transcript of jury selection reveals that along with Ms. Banner, jurors Wayne Robinson and Katherine Shook also worked at Forsyth Medical Center. Similar to Ms. Banner, Mr. Robinson expressed concern about missing work to attend court due to a lack of paid time off. Mr. Robinson was excused for cause. Ms. Shook was excused using a peremptory challenge at the same time as Ms. Banner.

> THE COURT: The State want to make inquiry of
> this juror then?

The State chose not to challenge Ms. Banner for cause and made no further inquiry

at that time. The Court then resumed its questioning of other prospective jurors.

The next interaction with Ms. Banner took place during the State's voir dire

when Ms. Banner had fallen asleep in the jury box while other prospective jurors

were being questioned.

> [THE STATE]: Come down to you, Ms. Banner.
> Wake up.
>
> MS. BANNER: I told you I didn't do well early.
>
> [THE STATE]: But you'd be at work now, wouldn't
> you?
>
> MS. BANNER: Yeah.

Neither the trial court nor defense counsel interjected to suggest Ms. Banner had not

fallen asleep.

Thereafter, Ms. Banner acknowledged that she had no personal or moral

objections to the death penalty, but her work and lack of paid time off would likely

affect her ability to listen to the evidence and follow the trial court's instructions. In

addition, it was revealed in questions directed to all the jurors that Ms. Banner did

not own the residence in which she lived.

**B. Voir Dire of Mr. Smalls**

As with Ms. Banner, the transcript indicates that Mr. Smalls "nodded off" and

"went to sleep" during jury selection.  His responses to the initial questions from the trial court were unremarkable, but during questioning by the State, the following exchange occurred:

> [THE STATE]: It's vitally important that everybody know the State is very concerned about whether everybody can consider the death penalty and the defendant is concerned about whether everybody will automatically impose the death penalty and won't consider the option of life without parole so I'm sorry it gets lengthy but it has got to be done.
>
> Mr. Smalls, can you please tell me about your feelings about the death penalty.
>
> MR. SMALLS: I cannot give an answer to that.
>
> [THE STATE]: Let me ask you do you feel like it's a necessary part of the law?
>
> MR. SMALLS: I think it's a part of the law.
>
> [THE STATE]: Do you think it's a necessary part of the law?
>
> MR. SMALLS: I don't know.
>
> [THE STATE]: Do you have any personal, moral or religious or philosophical beliefs against the death penalty or capital punishment?
>
> MR. SMALLS: I believe in capital punishment.
>
> [THE STATE]: You do?
>
> MR. SMALLS: Yes.
>
> [THE STATE]: Do you think that under some

appropriate circumstances, and the judge will tell you what those circumstances are, that the death penalty is an appropriate punishment in some cases?

MR. SMALLS: I guess so. I don't know.

[THE STATE]: Do you belong to any churches or any organizations that oppose the death penalty?

MR. SMALLS: Yes, I'm a Christian.

[THE STATE]: There is a wide broad views in the church. Some churches oppose the death penalty, others feel it's appropriate and have taken a stand. Has your church taken a stand against the death penalty?

MR. SMALLS: I don't know. I can't speak for all of my church. I can only speak for myself.

[THE STATE]: Well that's what is most important. Do you feel that if the circumstances were appropriate that you could vote to impose the death penalty?

MR. SMALLS: I still don't know.

[THE STATE]: You'd have to wait to hear all the evidence?

MR. SMALLS: Yes, sir.

[THE STATE]: Let me ask you, Mr. Smalls, if the State—at the guilt/innocence phase—satisfies its burden to prove the defendant's guilt beyond a reasonable doubt based on one or both of the theories of first degree murder that I've talked about—premeditation and deliberation or felony murder—could you find the defendant guilty?

MR. SMALLS: I guess so.

[THE STATE]: If the law—if the State satisfied its burden and the judge instructed you and gave you the law with regards to the various elements of premeditation and deliberation and felony murder and the State proved those to you beyond a reasonable doubt, would you be able to find the defendant guilty?

MR. SMALLS: I guess so.

[THE STATE]: Having made that decision at the guilt/innocence if the jury determined unanimously that the defendant was guilty of first degree murder and we move on to the second stage and you were satisfied beyond a reasonable doubt that the death penalty was the appropriate punishment after going through the detailed instructions the Court will give you at that second stage, would you be able to vote to impose the death penalty?

MR. SMALLS: I'll have to wait. I'll have to wait until that time comes.

[THE STATE]: Do you feel—well, let me ask you are there some circumstances you feel where the death penalty is appropriate?

MR. SMALLS: Sometimes. Sometimes I think so.

[THE STATE]: Do you feel like you could be part of a jury that comes back and makes a recommendation of the death penalty to the Court in this case?

MR. SMALLS: I guess so.

[THE STATE]: When you say you guess so, does that

mean—

MR. SMALLS: —If I have to.

[THE STATE]: If you have to?

MR. SMALLS: Yes. If there is no way out.

[THE STATE]: If there is no way out?

MR. SMALLS: Yes.

## C. Voir Dire of Mr. Mills

When Mr. Mills was seated as a prospective alternate juror, the trial court questioned him on whether he had heard or seen anything about the case in the newspaper or from another source. Although Mr. Mills had not read about the case in the newspaper, he stated that he had "heard about it . . . [in] talk around the street." When the trial court asked Mr. Mills whether he had formed or expressed an opinion on the guilt or innocence of defendant based on what he heard, Mr. Mills responded that he "didn't comment on it." When asked to clarify what he meant, Mr. Mills responded, "I didn't comment on it. When I heard it, I didn't comment on it." The trial court moved on to questions about the death penalty and life without parole and asked if Mr. Mills had any reservations about the death penalty, and Mr. Mills responded that he was not against it.

Mr. Mills responded to several of the State's questions with "yes" and "no" answers with no elaboration. Mr. Mills was specifically asked if he had been

convicted of any criminal offense other than traffic offenses, and he replied, "No." Contrary to Mr. Mills' representation, the State had discovered in its pretrial research that he had been convicted of solicitation of prostitution.

## D. Defendant's Objections

The State struck each of these prospective jurors using peremptory challenges, and defendant objected to each strike pursuant to *Batson*.

In attempting to establish a prima facie case of racial discrimination, defendant contended that Ms. Banner showed unwavering support for the death penalty, noting that "right down the line Ms. Banner answered yes, yes, yes, yes just like everybody else on that jury and even more so." Defendant argued that other jurors passed by the State were not as strong on the death penalty as Ms. Banner, because their responses only suggested that they "could consider" the death penalty or that "it was appropriate in some cases." Defendant further contended that even though Ms. Banner raised the issue of her lack of paid time off, in the end, Ms. Banner "was very clear that [she] understood her duty [as a juror] overrode [her work responsibilities]." Moreover, defendant argued that Ms. Banner "very candidly said she wouldn't hold [issues concerning her work schedule] against either party and she could be fair to both sides." Defendant stated that "no race[-]neutral reason" justified the use of the peremptory challenge against Ms. Banner.

Concerning Mr. Smalls, defendant contended even though Mr. Smalls "was a

little more hesitant" on the death penalty questions than Ms. Banner, Mr. Smalls conveyed that he believed in capital punishment if it was appropriate under the circumstances. Defendant stated that there was "no race[-]neutral basis" for the State's peremptory strike on Mr. Smalls.

Before ruling on defendant's *Batson* objections to the State's peremptory strikes of Ms. Banner and Mr. Smalls, the State and defendant stipulated that defendant and the victim, Mr. Williams, were both black. The parties also stipulated that of the two officers involved in the case, one was black and the other was white. The trial court further noted, and both defendant and the State agreed, that race was not an issue in the case.

The trial court determined that defendant had not established a prima facie case of purposeful discrimination. However, the trial court stated that it would "give the State the opportunity . . . to address the issue of whether or not the challenge . . . has been done on a race[-]neutral basis" in order to make a record for appeal. The State indicated that it would respond with its race-neutral explanations if ordered to by the trial court because such an order would not waive defendant's burden of establishing a prima facie case. The trial court stated that "I think this Court's ruling is correct. I don't think there is a prima facie case," but nonetheless asked the State to articulate its race-neutral reasons.

As to the peremptory strike for Ms. Banner, the State noted that Ms. Banner

was sleeping during jury selection, which "fit in" with her prior comment that she "doesn't do well in the morning hours" due to her work schedule. The State also explained that Ms. Banner had stated that she preferred not to serve, that she had concerns about paid time off, and that her work schedule would make it difficult to work most of the night and then have to be in court. The State explained that because the case involved "a lot of important evidence, . . . we need a juror who is awake and aware and not worried about work."

In addition, the State considered Ms. Banner's work as a nurse problematic for her jury service because, in the State's opinion, "those who save lives are often hesitant to make a recommendation for death." The State also expressed concern that Ms. Banner showed a "lack of stake in the community," pointing to the fact that she was not a homeowner and was not registered to vote.

Regarding Mr. Smalls, the State explained that he "nodded off and went to sleep one time [and the State] saw him startle and wake up during the selection of the other jurors." This statement was not disputed by defendant or the trial court.[3]

---

[3] Our dissenting colleague's reliance on *Snyder v. Louisiana*, 552 U.S. 472 (2008) is misplaced for two reasons. First, contrary to our colleague's indication that deference is *only* warranted when a trial court makes findings regarding a juror's demeanor, *Snyder* states more broadly that "deference is *especially* appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." *Id*. at 479 (emphasis added). Second, unlike in *Snyder*, and as discussed in more detail herein, step one of *Batson* is not moot in this case. *See State v. Snyder*, 750 So.2d 832, 841 (La. 1999) (noting that the State offered race-neutral reasons before the trial court made a "finding as to whether

The State expressed concern regarding Mr. Smalls' body language and asserted that his responses were inappropriate because they were "middle of the road responses," and as a result, the State "didn't feel he was very strong on the death penalty." Specifically, the State recounted that Mr. Smalls said he did not know what he felt about the death penalty, then "put his head down and began talking to the floor," and "did not ever make eye contact" with prosecutors during the death penalty questions. Further, the State noted that Mr. Smalls "was often looking up" and was "mumbling and talking to himself." The State explained that Mr. Smalls' statement that he could consider the death penalty "if he had to" was inappropriate.

After the State's proffered reasons for exercising peremptory challenges for both Mr. Smalls and Ms. Banner, the trial court announced its finding that there were thirty-nine prospective jurors in the entire jury venire and that seven were black. Of the four black jurors that had been called by the clerk as potential jurors

---

defendant had made a prima facie showing of purposeful racial discrimination."). However, even though the trial court was not required to make findings regarding pretext because step one was not moot, the trial court stated that "the district attorney observed that [Mr. Smalls] nodded off to sleep at one time . . . ." Defendant did not object or otherwise argue to the contrary.

We also note that, despite the trial court's statement, our colleague implies that the prosecutor's observation that Mr. Smalls "nodded off" was untruthful. The fact that a juror "nodded off" seems highly relevant to his or her ability to serve, regardless of skin color. But according to our colleague, "it is more likely that [the prosecutor]'s choice of words evince [the prosecutor]'s reliance on the [CLE handout] by echoing the handout's language of 'obvious boredom [which] may show anti-prosecution tendencies.' " It is a remarkable feat indeed to extract this reading from the record as it exists in this case.

for the trial, two were excused using peremptory challenges and two were excused for cause.[4] Of the four peremptory strikes exercised by the State at that time, two were for white prospective jurors and two were for black prospective jurors. At the time the peremptory challenges were made, eleven jurors had been seated—nine were white and two were black.

The trial court found that "the questions and statements of the prosecuting attorney during jury selection do not tend to support an inference of discrimination," and that "each juror was examined substantially in the same format." The trial court found that there had not been "a repeated use of peremptory challenges" against black jurors such that a pattern of strikes against black jurors had arisen. Finally, the trial court found that there had "not been a disproportionate number of peremptory challenges" exercised to strike black jurors.

As such, the trial court found that "defendant ha[d] failed to raise an inference that the prosecuting attorney ha[d] . . . used the peremptory challenges to exclude [individuals] from the jury on account of race." The trial court did not characterize

---

[4] The trial court detailed on the record that two prospective black jurors, Mr. Leroy Robinson and Ms. Dorothy Nash, were excused for cause. Ms. Nash was removed for cause after she expressed unwavering opposition to the death penalty, and Mr. Robinson stated that he had prior knowledge of the case from media reports and had formed an opinion as to defendant's guilt or innocence. For clarity, we note that there are two jurors with the last name Robinson in the transcript: Wayne Robinson and Leroy Robinson; Mr. Leroy Robinson was identified as a black juror in the trial court's *Batson* findings.

its findings as a full *Batson* hearing, and defendant did not raise the issue of pretext, nor was it ever discussed by the trial court.

As to Mr. Mills, the prospective alternate juror, defendant argued that Mr. Mills was the eighth black potential juror to enter the juror box and that there appeared to be no race-neutral reason to strike Mr. Mills. Defendant explained that Mr. Mills believed in the death penalty and stated that he could follow the law. Defendant also noted that the jury was all white.

The trial court concluded again that race was not an issue in this case and that "the demeanor of the questions and statements of the prosecuting attorney during jury selection did not tend to support an inference of discrimination in the use of [the] peremptory challenge." The trial court also found that the format for questions was "typically the same for each juror without regard to race" and that "there ha[d] not been a disproportionate number of peremptory challenges to strike black jurors in this case."

The trial court made additional findings that of the thirty-nine jurors initially called on 6 February 1996, seven were black. Of the seven black jurors, three were excused for cause and four were excused by the State's peremptory challenges. Of the forty-eight jurors called on 8 February 1996, eight were black, and one black juror was excused by consent for pretrial knowledge and contact.

At close of court on 12 February 1996, no additional black jurors had been

called and twelve jurors had been seated for the trial. At that point, the State had exercised eleven peremptory challenges against prospective jurors—four were used against black jurors and seven were used against white jurors.

The trial court also addressed strikes used against prospective alternate jurors. The first alternate prospective juror called was white and was excused for cause. Mr. Mills was the second alternate prospective juror called. The trial court determined that defendant had not established a prima facie case of discrimination in striking Mr. Mills, but again requested that the State provide its reasons for the challenge.

The State, pursuant to the trial court's request, explained that Mr. Mills had been untruthful about his criminal record. Even though the State had accepted other jurors with criminal convictions, the concern with Mr. Mills was "his failure to acknowledge the criminal court convictions" and "the untruthful answers given." In addition, Mr. Mills hesitated on the death penalty questions; gave answers which were mostly "monosyllabic;" appeared to be "smiling inappropriately on a number of occasions;" and seemed confused during questioning.

After the State provided its race-neutral reasons, the trial court reiterated that defendant had failed to establish a prima facie case of discrimination. With each of the three prospective jurors at issue, the trial court never characterized the proceeding as a full *Batson* hearing, nor was pretext argued or ruled upon.

**E. Trial and Post Conviction Proceedings**

A Forsyth County jury convicted defendant of first-degree murder based on a theory of premeditation and deliberation and under the felony murder rule. *Tucker*, 347 N.C. at 239. Upon completion of the sentencing phase, the jury recommended that defendant be sentenced to death. *Id.* at 239. Consistent with that recommendation, the trial court sentenced defendant to death. *Id.* at 239.

Defendant appealed, and this Court determined that "defendant received a fair trial and capital sentencing proceeding, free from prejudicial error." *Id.* at 247.[5] Defendant did not raise a *Batson* issue on direct appeal.

In addition, defendant did not raise a *Batson* issue in his initial motion for appropriate relief (MAR) or subsequent amendments thereto. Defendant filed an MAR on October 6, 1998, and filed an amendment to that MAR on January 13, 2000. Defendant's motions were denied on May 11, 2000. Later, defendant received newly appointed counsel who filed an MAR in 2001 styled as a Second Amended Motion for Appropriate Relief. After evidentiary hearings in 2004 and 2006, defendant's MAR was denied and this Court denied certiorari in *State v. Tucker*, 361 N.C. 575 (2007) (mem.).

In 2010, defendant filed an MAR in Forsyth County Superior Court pursuant

---

[5] The Supreme Court of the United States denied certiorari in *Tucker v. North Carolina*, 523 U.S. 1061 (1998) (mem.).

to the Racial Justice Act (RJA).  In 2008, defendant filed a petition for writ of habeas corpus in federal district court, and defendant amended this petition in 2016 and 2017.  The federal court held defendant's federal habeas corpus proceedings in abeyance in 2010 while defendant's RJA claims were resolved.

In 2017, defendant filed another MAR and a second amendment to his RJA MAR.  The State filed an answer in 2018, defendant replied in 2018, and defendant filed an amendment to his MAR in 2019.  Then, in 2020, defendant, for the second time, amended his MAR.

In his 2017, 2019, and 2020 MARs, which are presently before the Court, defendant for the first time raised the *Batson* issue under a theory of newly discovered evidence.  The alleged newly discovered evidence which provides the basis for defendant's most recent post-conviction filings are a continuing legal education (CLE) handout and a statistical study on jury selection in North Carolina assembled by law professors from Michigan State University, along with a corresponding affidavit submitted by the authors of the study.  Defendant asked the MAR court to vacate his conviction and death sentence and order a new trial, asserting that newly discovered evidence allows him to overcome any procedural bar found in N.C.G.S. § 15A-1419.  Defendant further asserted that his claims were not barred under this Court's decision in *State v. Burke*, 374 N.C. 617 (2020).

The CLE handout is a one-page handout entitled "BATSON Justifications:

Articulating Juror Negatives." The CLE handout lists ten legally acceptable justifications for the use of peremptory challenges: (1) inappropriate dress; (2) physical appearance; (3) age; (4) attitude; (5) body language; (6) rehabilitated jurors or those who vacillate in answering the State's questions; (7) inappropriate, non-responsive, evasive, or monosyllabic responses; (8) communication difficulties, be it language barriers or difficulty understanding questions and the process; (9) unrevealed criminal history; and (10) any other signs of defiance, sympathy with the defendant, or antagonism to the State.

The statistical study was conducted by Catherine Grosso and Barbara O'Brien, two law professors at Michigan State University College of Law. *See* Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-*Batson *North Carolina Capital Trials*, 97 Iowa L. Rev. 1531 (2012) [hereinafter Grosso & O'Brien, *A Stubborn Legacy*]. The professors reviewed data concerning jury selection in North Carolina capital cases between 1990 and 2010. Pursuant to an affidavit from the professors proffered at the hearing on defendant's motion for appropriate relief, the study took less than one year to create as they "began data collection for the study in the fall of 2009 and completed it in the spring of 2010."[6]

---

[6] Defendant also asserted that a similar study on juror data constituted newly discovered evidence. *See* Ronald F. Wright, et al., *The Jury Sunshine Project: Jury Selection*

Defendant advances two primary arguments in his most recent MAR and amendments. First, defendant contends that not only was the CLE handout newly discovered evidence, but that Mr. Lang used language from the handout as his race-neutral justification for striking Ms. Banner, Mr. Smalls, and Mr. Mills. Second, defendant argued that the MSU study and the authoring professors' affidavit established a pattern of race-based strikes by both prosecutors in this case. Defendant asserts that the purported history of discrimination in Forsyth County, allegedly established not by court rulings but by statistical evidence, shows a pattern of discrimination which must be present in this case also.

On 24 August 2020, the MAR court entered an order denying defendant's MARs. That order is the subject of our review here. The MAR court expressly stated the scope of the order was limited to the 2017 MAR, 2019 MAR, and 2020 MAR filed by defendant "based on alleged newly discovered evidence." The RJA MARs were assigned to a separate judge and were not considered by the MAR court.

The MAR court's comprehensive order makes several pertinent findings of fact before ultimately denying defendant's claims because defendant "failed to show good cause, actual prejudice, or a fundamental miscarriage of justice" sufficient to overcome the procedural bar of N.C.G.S. § 15A-1419. Specifically, the MAR court

---

*as a Political Issue*, 2018 Ill. L. Rev. 1407 (2018). Our "good cause" analysis of the MSU study under N.C.G.S. § 15A-1419(c) applies equally to this study.

found that defendant failed to raise a *Batson* issue on direct appeal despite the fact that "the trial court identified the *Batson* issue as a possible issue on appeal and said so in the presence of the parties."[7]

In addition and contrary to defendant's argument, the MAR court held that *State v. Burke* cannot be read to prevent operation of the procedural bar in this case because *Burke* applied specifically to RJA MARs and "all of [d]efendant's RJA MARs are still pending and are beyond the scope of this [o]rder."

Defendant petitioned this Court for a writ of certiorari to review the order of the MAR court. This Court allowed reviewed pursuant to N.C.G.S. § 7A-32(b) on three issues: (1) whether the CLE handout and the MSU study constitute newly discovered evidence of purposeful discrimination in jury selection under *Batson v. Kentucky*, (2) whether defendant was in an adequate position to raise his *Batson* claim before he had access to the CLE handout and the MSU study, and (3) whether this Court's decision in *State v. Burke* forecloses acceptance of the State's procedural bar argument.

## II. Standard of Review

This Court reviews a lower court's order on motions for appropriate relief to determine "whether the findings of fact are supported by evidence, whether the

---

[7] Defendant conceded that his counsel was not ineffective for failing to raise the *Batson* issue on direct appeal or in his initial post-conviction filings.

findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *State v. Frogge*, 359 N.C. 228, 240 (2005) (quoting *State v. Stevens*, 305 N.C. 712, 720 (1982)). We review issues of law de novo. *State v. Biber*, 365 N.C. 162, 168 (2011).

## III. Analysis

### A. Procedural Bar

Section 15A-1419 of the North Carolina General Statutes provides a mandatory procedural bar for issues a party seeks to litigate in post-conviction proceedings. The procedural bar applies when any of the following circumstances are present:

> (1) Upon a previous motion made pursuant to this Article, the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so. . . .
>
> (2) The ground or issue underlying the motion was previously determined on the merits upon an appeal from the judgment or upon a previous motion or proceeding in the courts of this State or a federal court, unless since the time of such previous determination there has been a retroactively effective change in the law controlling such issue.
>
> (3) Upon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so.
>
> (4) The defendant failed to file a timely motion for appropriate relief as required by G.S. 15A-1415(a).

N.C.G.S. § 15A-1419(a) (2021). If any of these circumstances are present, "the court shall deny the motion . . . unless the defendant can demonstrate" that an exception applies. N.C.G.S. § 15A-1419(b) (2021); *see also State v. Murrell,* 362 N.C. 375, 402 (2008).

An exception to the procedural bar applies only if the defendant can demonstrate: (1) "[g]ood cause for excusing the ground for denial listed in subsection (a) of this section and . . . actual prejudice resulting from the defendant's claim," or (2) "[t]hat failure to consider the defendant's claim will result in a fundamental miscarriage of justice." N.C.G.S. § 15A-1419(b).

"[G]ood cause" exists under this section only if the defendant demonstrates "by a preponderance of the evidence that his failure to raise the claim or file a timely motion" was:

> (1) The result of State action in violation of the United States Constitution or the North Carolina Constitution including ineffective assistance of trial or appellate counsel;
>
> (2) The result of the recognition of a new federal or State right which is retroactively applicable; or
>
> (3) Based on a factual predicate that could not have been discovered through the exercise of reasonable diligence in time to present the claim on a previous State or federal postconviction review.

N.C.G.S. § 15A-1419(c) (2021).

"[A]ctual prejudice," within the meaning of subsection (b), exists only "if the defendant establishes by a preponderance of the evidence that an error during the trial or sentencing" raises a "reasonable probability, viewing the record as a whole, that a different result would have occurred but for the error." N.C.G.S. § 15A-1419(d) (2021).

"[A] fundamental miscarriage of justice," occurs only where:

(1) The defendant establishes that more likely than not, but for the error, no reasonable fact finder would have found the defendant guilty of the underlying offense; or

(2) The defendant establishes by clear and convincing evidence that, but for the error, no reasonable fact finder would have found the defendant eligible for the death penalty.

N.C.G.S. § 15A-1419(e) (2021).

The post-conviction procedure set forth above serves a critical role in our criminal justice system. Not only does it provide for review and potential relief to defendants convicted of crime, but the process also promotes finality. *See* N.C.G.S. § 15A-1415, Official Commentary (2021) ("[A]dditional finality has been added in G.S. 15A-1419 by making it clear that there is but one chance to raise available matters after the case is over, and if there has been a previous assertion of the error, or opportunity to assert the error, by motion or appeal, a later motion may be denied on that basis."); *see also* N.C.G.S. § 15A-1419, Official Commentary (2021) ("[O]nce . . . there has been opportunity to litigate a matter, there will not be a right to seek relief

by additional motions at a later date. . . . [I]f there has been an opportunity to have the matter considered on a previous motion for appropriate relief or appeal the court may deny the motion for appropriate relief.").

It is imperative, not only for the parties, but also for federal habeas review, that we strictly and regularly follow our post-conviction procedural requirements. *See Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *see also Cnty. Ct. of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 148 (1979) (determining whether an independent and adequate state procedural ground was utilized by the state court which would bar the federal courts from addressing the issue on habeas corpus); *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964) ("We have often pointed out that state procedural requirements which are not strictly or regularly followed cannot deprive us of the right to review.").

### 1. *Batson*

We first address defendant's argument that the procedural bar of subsection 15A-1419(a) does not apply to his *Batson* claim because at the time of his direct appeal and initial MAR proceedings, he did not have access to the CLE handout or the MSU study and was therefore not "in a position to adequately raise the . . . issue." N.C.G.S. § 15A-1419(a). To do so, we begin with the essential tenets of *Batson* and the MAR court's application of those tenets to defendant's claim.

The "Constitution forbids striking even a single prospective juror for a

discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (quoting *United States v. Vasquez–Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)). "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).

The North Carolina Constitution states that "[n]o person shall be excluded from jury service on account of sex, race, color, religion, or national origin." N.C. Const. art. I, § 26. Thus, the North Carolina Constitution specifically "bars race-based peremptory challenges." *State v. Nicholson*, 355 N.C. 1, 21 (2002) (citing *State v. Fletcher*, 348 N.C. 292, 312 (1998), *cert. denied*, 525 U.S. 1180 (1999)). "[O]ur courts have adopted the *Batson* test for reviewing the validity of peremptory challenges under the North Carolina Constitution." *State v. Campbell*, 384 N.C. 126, 133 (2023) (quoting *Nicholson*, 355 N.C. at 21).

"When a defendant raises a *Batson* objection, the trial court must engage in a three-step inquiry to evaluate the merits of the objection." *Id.* First, a defendant must "establish a *prima facie* case that the peremptory challenge was exercised on the basis of race." *State v. Cummings*, 346 N.C. 291, 307–08 (1997). "A defendant meets his or her burden at step one 'by showing that the totality of the relevant facts gives rise to [an] inference of discriminatory purpose.'" *Campbell*, 384 N.C. at 134 (quoting *Batson*, 476 U.S. at 94). A "prosecutor's questions and statements during

voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 97.

"Where the trial court rules that a defendant has failed to make a prima facie showing [at step one], our review is limited to whether the trial court erred in finding that the defendant failed to make a prima facie showing, even if the State offers reasons for its exercise of the peremptory challenges." *State v. Locklear*, 349 N.C. 118, 137 (1998) (first citing *State v. Hoffman,* 348 N.C. 548, 554 (1998); and then citing *State v. Williams*, 343 N.C. 345, 359 (1996), *cert. denied*, 519 U.S. 1061 (1997)). "[W]e do not consider at step one the State's *post facto* reply to the trial court's request for a step two response." *Campbell*, 384 N.C. at 136. Further, "[w]here 'the trial court clearly rule[s] there ha[s] been no prima facie showing' . . . this Court does 'not consider whether the State offered proper, race-neutral reasons for its peremptory challenge.'" *Id*. (quoting *State v. Hoffman*, 348 N.C. 548, 552 (1998)). Thus, a *Batson* inquiry concludes "when the trial court . . . determine[s] that defendant failed to make a prima facie showing." *Id.*

Although a step one showing by defendant may be mooted "when the trial court does not explicitly rule on whether the defendant made a *prima facie* case, and . . . the State [voluntarily] proceeds to the second prong of *Batson* by articulating its explanation for the challenge," *State v. Golphin*, 352 N.C. 364, 426 (2000), our precedent is clear that a prima facie showing by defendant is an important step in a

*Batson* analysis. Thus, step one will not be rendered moot, and will therefore remain subject to review, when the trial court determines that the "*defendant failed to make a* prima facie *showing before the prosecutor articulated his reasons for the peremptory challenges.*" *State v. Hoffman*, 348 N.C. 548, 551–52 (1998) (quoting *State v. Williams*, 343 N.C. 345, 359 (1996), *cert. denied*, 519 U.S. 1061 (1997)). In fact, we have expressly stated that it is error for a trial court to require a step two explanation in the absence of a prima facie showing by defendant. *See Campbell*, 384 N.C. at 136 ("Whatever the reason, the *Batson* inquiry should have concluded when the trial court first determined that defendant failed to make a prima facie showing.").

Only when the trial court determines that a defendant successfully established prima facie showing will the *Batson* inquiry proceeds to the second step. *Id.* at 134. There, "the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991) (citing *Batson*, 476 U.S. at 97–98). "*Batson*'s requirement of a race-neutral explanation means an explanation other than race." *Id.* at 374 (O'Connor, J., concurring). "[E]ven if the State produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three." *Johnson v. California*, 545 U.S. 162, 171 (2005).

In the third and final step of the *Batson* inquiry, "the trial court must determine whether the defendant has carried his burden of proving purposeful

discrimination." *Hernandez*, 500 U.S. at 359 (citing *Batson*, 476 U.S. at 98). "No matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause *unless it is based on race*." *Id.* at 375 (O'Connor, J., concurring) (emphasis added). At this step, the trial court must "determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019). "The ultimate inquiry is whether the State was motivated in substantial part by discriminatory intent." *Id.* at 2244 (cleaned up).

"[T]he job of enforcing *Batson* rests first and foremost with trial judges." *Id.* at 2243. Thus, "when a trial court rules that a defendant has failed to demonstrate a prima facie case of discrimination, '[t]he trial court's ruling is accorded deference on review and will not be disturbed unless it is clearly erroneous.'" *Campbell*, 384 N.C. at 131–32 (alteration in original) (quoting *State v. Augustine*, 359 N.C. 709, 715 (2005)); *see also State v. Hobbs*, 374 N.C. 345, 349 (2020); *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Hernandez*, 500 U.S. at 364. "The ability of the trial judge to observe firsthand the reactions, hesitations, emotions, candor, and honesty of the lawyers and veniremen during voir dire questioning is crucial to the ultimate determination" of whether a prosecutor is acting with discriminatory purpose. *State v. Smith*, 328 N.C. 99, 127 (1991).

"Trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Campbell*, 384 N.C. at 131 (quoting *Batson*, 476 U.S. at 97). Just as judges may consider questions and statements of prosecutors when determining whether a prima facie case has been established by defendant at step one, judges may also consider plainly observable prospective juror conduct—such as falling asleep—which would justify the use of a peremptory strike. The law does not require that trial judges disregard evidence of such conduct in considering whether a prima facie case of discrimination has been established. "An appellate court is not required to, and should not, assume error by the trial judge when none appears on the record before the appellate court." *Id*. at 138 (quoting *State v. Alston*, 307 N.C. 321, 341 (1983)).

### 2. *MAR Court Order*

#### a. *Mootness*

The MAR court reviewed defendant's *Batson* argument in a thorough thirty-six-page order, making extensive findings of fact and conclusions of law. In accordance with our precedent, the MAR court first determined that because the trial court ruled that defendant failed to establish a prima facie case of purposeful discrimination *prior* to the trial court's request that the State articulate its race-neutral reasoning for striking Ms. Banner, Mr. Smalls, and Mr. Mills, step one of

*Batson* was not moot.  Relying on *Locklear*, the MAR court properly limited its review to step one.  The MAR court further found that the hearing in the trial court was not a "full hearing" on defendant's *Batson* claim because pretext in the third step was never discussed by defendant at trial, nor did the trial court rule on any third-step issue of pretext.

In contrast with the finding of the MAR court, defendant argues, and the State concedes, that step one of the *Batson* inquiry is moot, citing this Court's decision in *Hobbs*, 374 N.C. at 354.  However, that understanding between the parties is immaterial as a stipulation to an issue of law is not binding upon the Court.  *See Quick v. United Benefit Life Ins. Co.*, 287 N.C. 47, 56 (1975) ("[T]heir misapprehension is immaterial for the stipulation was one of law and therefore not binding upon the court."); *Moore v. State*, 200 N.C. 300, 301 (1931) ("[W]hile the parties to an action or proceeding may admit or agree upon facts[,] they cannot make admissions of law which will be binding upon the courts."); *see also Rawlings v. Neal*, 122 N.C. 173 (1898); *Binford v. Alston*, 15 N.C. (4 Dev.) 351, 354 (1833).  Thus, parties may not by agreement bind or otherwise compel this Court to adhere to an application of the law that is inconsistent with an interpretation articulated by this Court.  After all, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The present case is readily distinguishable from those in which this Court has

found step one of the *Batson* inquiry moot.  In *Hobbs*, this Court relied on our decision in *State v. Robinson*, 330 N.C. 1, 17 (1991), where we held that it was "unnecessary to address the trial court's conclusion that defendant failed to make a prima facie case of discrimination because . . . the State *voluntarily* proffered explanations for each peremptory challenge."  (Emphasis added.)  Further, *Hobbs* expressly required us to review what had been characterized as "a full hearing on the defendant's *Batson* claim."  374 N.C. at 348.  That is not the situation here.

Here, the *Batson* inquiry included a clear ruling that defendant had failed to establish a prima facie case of purposeful discrimination at step one.  Unlike *Robinson*, the State did not thereafter "voluntarily" proceed to step two.  Instead, the State was directed by the trial court to proffer its race-neutral reasons for striking the jurors to bolster the appellate record in the event that an appellate court overruled the trial court's step one determination.  Moreover, the inquiry never proceeded to step three, and the trial court never characterized the inquiry as a "full hearing."  Accordingly, this case is readily distinguishable from both *Hobbs* and *Robinson*.

We note that defendant relies on a 2020 report by the North Carolina Task Force for Racial Equity in Criminal Justice to argue that this Court should radically alter our *Batson* jurisprudence.  The task force, chaired at the time of the report by Attorney General Joshua Stein and a member of this Court, Justice Earls,

recommended that this Court enact several "administrative" rule changes, including elimination of the requirement for a prima facie showing in Batson altogether, "disallowing strikes where race could be a factor, reconsidering commonly accepted 'race[-]neutral' justifications for strikes, and disallowing demeanor-based strikes."[8] N.C. Task Force for Racial Equity in Criminal Justice, Report 2020, at 102 (2020), *available at* https://ncdoj.gov/wp-content/uploads/2021/02/TRECReportFinal_02262021.pdf.

As is most relevant here, the task force's recommendation to abolish a defendant's burden at step one of *Batson* states openly what a member of that task force has thus far implied vis-à-vis an analytical framework that would see most step one determinations rendered moot on appeal. *See Campbell*, 384 N.C. at 139–43 (Earls, J., dissenting). We once again reject the notion that a trial court's clear determination that no prima facie case has been made should be swept aside on appellate review merely due to a trial court judge's erroneous attempt to preserve

---

[8] This Court does not question that racial discrimination has been and, in portions of society, continues to be a pervasive evil that deprives citizens of every race of their constitutional right to equal protection of the laws. Interestingly, however, the task force's recommendations would effectively eliminate the ability to peremptorily challenge *any* juror because an argument could be made that any challenge would qualify as a strike "where race could be a factor" – even when a juror falls asleep during jury selection. We reaffirm that, subject only to the commands of the Equal Protection Clauses of the United States Constitution and the North Carolina Constitution, "peremptory strikes . . . may be used to remove any potential juror for any reason—no questions asked." *Flowers*, 139 S. Ct. at 2238.

judicial resources by bolstering the appellate record.

When, as here, the trial court determines that a defendant has "failed to make a prima facie showing" of purposeful discrimination on the basis of race, the *Batson* inquiry concludes. *Campbell*, 384 N.C. at 135–36. For each of the potential jurors at issue here, the trial court clearly ruled that no prima facie showing of purposeful discrimination had been established. The *Batson* inquiry should have ended at that point, and it was error for the trial court to direct the State to place its race-neutral reasons on the record. *Id.* at 136. Therefore, the MAR court's findings of fact that the trial court ruled on step one prior to requesting the State's race-neutral reasons and that no full *Batson* hearing occurred support its conclusion of law that step one is not moot, and the MAR court properly limited its review of the trial court's *Batson* inquiry to step one.

### b. *Position to Adequately Raise*

As noted above, defendant's *Batson* claim is barred if, upon a previous appeal or previous motion for appropriate relief, he was "in a position to adequately raise the . . . issue . . . but did not do so," and no exception to the bar applies. N.C.G.S. § 15A-1419(a)–(b). Subsection 15A-1419(a)(3) " 'is not a general rule that *any* claim not brought on direct appeal is forfeited on state collateral review' [but rather] requires the reviewing court, instead, 'to determine whether the particular claim at issue *could* have been brought on direct review.' " *State v. Hyman*, 371 N.C. 363, 383 (2018)

(emphasis added) (quoting *State v. Fair*, 354 N.C. 131, 166 (2001)). The MAR court found that: (1) "the trial court identified the *Batson* issue as a possible issue on appeal and said so in the presence of the parties;" (2) "[d]efendant was on actual notice that a *Batson* claim could be an appellate issue;" and (3) "despite being on actual notice that a *Batson* claim could be an appellate issue, [d]efendant failed to assert any *Batson* claim on direct appeal or in his 1998 MAR, 2000 MAR or 2001 MAR." Accordingly, the MAR court found "there was nothing that prevented [d]efendant from asserting a *Batson* claim on direct appeal or in one of his prior MARs."

The trial transcript shows that defendant promptly objected on *Batson* grounds to the State's peremptory challenges of both Mr. Smalls and Ms. Banner first and then Mr. Mills. The trial court ruled that defendant failed to establish a prima facie case of purposeful discrimination on the basis of race.

Defendant does not contest that he failed to raise a *Batson* claim in his direct appeal to this Court despite having raised a *Batson* objection at trial, receiving a ruling from the judge, and having the trial court note on the record that the issue may be the subject of review on appeal. *See Tucker*, 347 N.C. 235 (1997). Defendant was in an adequate position to raise a *Batson* claim on direct appeal but failed to do so. N.C.G.S. § 15A-1419(a)(3).

In addition, the same circumstances which would have allowed defendant to raise his *Batson* claim on direct appeal would have allowed defendant to raise a

*Batson* claim in one of his prior MARs. Therefore, defendant was in an adequate position to raise, and in fact could have raised, his *Batson* claim on a previous MAR but failed to do so. N.C.G.S. § 15A-1419(a)(1). The MAR court's findings of fact support its conclusion that defendant was in a position to adequately raise the *Batson* issue previously but failed to do so. Thus, defendant's *Batson* claim is barred unless defendant can demonstrate an exception to this mandatory bar.

**B. Exception to the Procedural Bar**

Defendant argues the "good cause" exception found in subsection 15A-1419(b)(1) applies because the CLE handout and the MSU study at issue here were not available at his trial, and he was therefore prevented from raising the claim on direct appeal. However, the bulk of defendant's argument ignores step one of the *Batson* inquiry and focuses on pretext at step three, which is not the pertinent issue as set forth above.

Because defendant offers the CLE handout and the MSU study as "newly discovered evidence" of purposeful discrimination and pretextual reasons proffered by the State in striking Ms. Banner, Mr. Smalls, and Mr. Mills, defendant's purported "newly discovered" evidence does not address his failure to establish a prima facie case at step one. The proper inquiry is whether this "evidence" constitutes "a factual predicate that could not have been discovered through the exercise of reasonable diligence in time to present the claim on a previous State or federal postconviction

review," N.C.G.S. § 15A-1419(c)(3), and, if so, whether defendant can then demonstrate that the absence of this evidence caused "actual prejudice," i.e., "a reasonable probability" of a different step one outcome. N.C.G.S. § 15A-1419(b)(1), (d).

### 1. Good Cause

As noted,

> good cause may only be shown if the defendant establishes by a preponderance of the evidence that his failure to raise the claim or file a timely motion was:
>
> (1) The result of State action in violation of the United States Constitution or the North Carolina Constitution including ineffective assistance of trial or appellate counsel;
>
> (2) The result of the recognition of a new federal or State right which is retroactively applicable; or
>
> (3) Based on a factual predicate that could not have been discovered through the exercise of reasonable diligence in time to present the claim on a previous State or federal postconviction review.

N.C.G.S. § 15A-1419(c).

However, the legislature specifically exempted from the definition of good cause "[a] trial attorney's ignorance of a claim, inadvertence, or tactical decision to withhold a claim." *Id.* "[A] deliberate, tactical decision not to pursue a particular claim is the very antithesis of the kind of circumstance that would warrant excusing a defendant's failure to adhere to a State's legitimate rules for the fair and orderly

disposition of its criminal cases." *Smith v. Murray*, 477 U.S. 527, 534 (1986).

When determining whether good cause exists to overcome a procedural bar, the question is whether, at the time of the procedural default, the claim was available at all. *Id.* at 537. Accordingly, for cause sufficient to overcome the procedural bar, it must exist beyond the control of counsel—it must not be subject to counsel's manipulation, but rather, truly unavailable.

### a. CLE Handout

As an initial matter, we note that because review of the *Batson* issue here is limited to step one, the CLE handout listing various race-neutral reasons for peremptory challenges at step two is irrelevant. We can discern no possible scenario in which, had defendant possessed this CLE handout, it would have assisted defendant in carrying his burden at step one.[9] At most, this handout is "evidence" that a prosecuting attorney attended a CLE class on jury selection. Any argument related to a prosecutor's step two explanation at step one would be purely conjecture and speculation because mere possession of a CLE handout from a State Bar sanctioned CLE class does not raise an inference that a peremptory challenge was based on race. Nevertheless, we address whether defendant's acquisition of this CLE

---

[9] To the extent defendant raises an argument regarding pretext, such argument is properly considered at step three of *Batson* and is irrelevant to the trial court's determination at step one—which is why defendant did not make such an argument at trial.

handout constitutes good cause, and whether his failure to previously acquire it resulted in actual prejudice.

The MAR court found that the [CLE] handout could not be "newly discovered" because the information contained therein followed and was supported by established caselaw and defendant "by the exercise of reasonable diligence[ ] could have conducted legal research . . . to determine that the reasons contained in the [CLE] handout referenced established case law." The MAR court reviewed cases in which "race-neutral reasons or explanations" to exercise a peremptory challenge had been analyzed in prior court decisions. The trial court noted that the cases it had reviewed were similar "in form and substance to the list of reasons or explanations set forth on the [CLE] handout." The list of cases and the acceptable reason for striking a potential juror the MAR court provided is as follows:[10]

> Knowledge of the case. *State v. Thomas*, 329 N.C. 423, 430–33 (1991); *State v. Thomas*, 350 N.C. 315, 333–35 (1999).
>
> Belief that criminal justice system operates unfairly before facts presented. *State v. Porter*, 326 N.C. 489, 499–502 (1990).
>
> Inappropriate dress. *State v. Headen*, 206 N.C. App. 109, 116–17, *rev. denied*, 364 N.C. 607 (2010).
>
> Reservations or doubts about the death penalty. *State v.*

---

[10] To improve readability, this list has been slightly reformatted from the original MAR court's order.

*Basden*, 339 N.C. 288, 297–98 (1994); *State v. Locklear*, 349 N.C. 118, 139–140 (1998); *State v. Rogers*, 355 N.C. 420, 444–46 (2002).

Physical appearance. *Purkett v. Elem*, 514 U.S. 765, 769 (1995); *State v. Barnes*, 345 N.C. 184, 210–13 (1997); *State v. Headen*, 206 N.C. App. 109, 116–17, *rev. denied*, 364 N.C. 607 (2010).

Age being too young or close to defendant's age, or a relative's age close to defendant's age. *State v. Jackson*, 322 N.C. 251, 255–57 (1988); *State v. Smith*, 328 N.C. 99, 125–27 (1990); *State v. Thomas*, 329 N.C. 423, 430–33 (1991); *State v. Barnes*, 345 N.C. 184, 210–13 (1997).

Attitude. *State v. Jackson*, 322 N.C. 251, 255–57 (1988) (including, among other reasons, citation of another case where lack of eye contact was a race-neutral reason); *State v. Sanders*, 95 N.C. App. 494, 501–03, *rev. denied*, 325 N.C. 712 (1989); *State v. Porter*, 326 N.C. 489, 499–502 (1990) (including, among other reasons, excessive eye contact with defense counsel and failure to make eye contact with the prosecutor); *State v. Barnes*, 345 N.C. 184, 210–13 (1997) (including, among other reasons, failure to maintain eye contact with the prosecutor); *State v. Locklear*, 349 N.C. 118, 139–40 (1998); *State v. Rogers*, 355 N.C. 420, 444–46 (2002).

Body language. *State v. Jackson*, 322 N.C. 251, 255–57 (1988); *State v. Barnes*, 345 N.C. 184, 210–11 (1997).

History of unemployment or unsteady employment. *State v. Sanders*, 95 N.C. App. 494, 501–03, *rev. denied*, 325 N.C. 712 (1989); *State v. Porter*, 326 N.C. 489, 499–502 (1990); *State v. Barnes*, 345 N.C. 184, 210–13 (1997).

Rehabilitated jurors and those that vacillate in answering questions. *State v. Robinson*, 330 N.C. 1, 17–20 (1991).

Unstable/lack of a stake in the community. *State v. Sanders*, 95 N.C. App. 494, 501–03, *rev. denied*, 325 N.C.

712 (1989); *State v. Thomas*, 329 N.C. 423, 430–33 (1991); *State v. Barnes*, 345 N.C. 184, 210–13 (1997); *State v. Thomas*, 350 N.C. 315, 333–35 (1999).

Inappropriate or inconsistent juror responses. *State v. Smith*, 328 N.C. 99, 125–27 (1990); *State v. Peterson*, 344 N.C. 172, 176–77 (1996).

Communication difficulties/lack of attention. *State v. Jackson*, 322 N.C. 251, 255–57 (1988); *State v. Robinson*, 330 N.C. 1, 17–20 (1991); *Hernandez v. New York*, 500 U.S. 352, 356–72 (1991) (plurality opinion); *State v. Caporasso*, 128 N.C. App. 236, 243–44, *appeal dismissed*, 347 N.C. 674 (1998).

Criminal history or relative's criminal history. *State v. Sanders*, 95 N.C. App. 494, 501–03, *rev. denied*, 325 N.C. 712 (1989); *State v. Porter*, 326 N.C. 489, 499–502 (1990); *State v. Robinson*, 330 N.C. 1, 17–20 (1991); *State v. Burge*, 100 N.C. App. 671, 674 (1990), *rev. denied*, 328 N.C. 272 (1991); *State v. Peterson*, 344 N.C. 172, 176–77 (1996); *State v. Locklear*, 349 N.C. 118, 139–140 (1998); *State v. Rogers*, 355 N.C. 420, 444–46 (2002).

Antagonism to the State or sympathy with defendant. *State v. Jackson*, 322 N.C. 251, 255–57 (1988); *State v. Porter*, 326 N.C. 489, 499–502 (1990); *State v. Burge*, 100 N.C. App. 671, 674 (1990), *rev. denied*, 328 N.C. 272 (1991); *State v. Thomas*, 329 N.C. 423, 430–33 (1991); *State v. Barnes*, 345 N.C. 184, 210–13 (1997); *State v. Rogers*, 355 N.C. 420, 444–46 (2002).

The MAR court also determined that the CLE handout provided

accurate and correct statements of law of both the United States Supreme Court and the North Carolina appellate courts concerning appropriate race-neutral and constitutionally permissible reasons to exercise a peremptory challenge when such facts arise in a particular

> case, as well as handwriting[11] that identifies when it would be improper to exercise a peremptory challenge. There is nothing inherently wrong . . . with a handout containing accurate statements of the law regarding permissible and impermissible reasons to exercise a peremptory challenge. Moreover, such a handout containing accurate statements of the law should be expected when attending a CLE class on jury selection.

A review of the cases cited by the MAR court reveals that the MAR court correctly found that the CLE handout does little more than restate, in a list format, the established caselaw reviewing legally permissible reasons to exercise a peremptory challenge of a potential juror. In reaching its conclusion that the CLE handout was not evidence of racial discrimination, the MAR court reasoned that

> when any attorney or judge attends a CLE o[r] CJE on a particular legal subject, it is expected that accurate and correct statements of the law on a particular subject will be given to the attendee. Similarly, any handout on a particular legal subject should contain accurate and correct statements of the law.

Additionally, the MAR court explained that "[t]here is nothing wrong or improper with knowing legally permissible and impermissible reasons to exercise peremptory challenges," noting that trial preparation requires that attorneys understand "legally permissible and impermissible reasons to exercise peremptory

---

[11] The handwriting referenced appears on the CLE handout provided in Defendant's Appendix. It reads "[d]on't use gender/race reasons in NC." It also states "may be expanded to othe[r] 'cognizable Equ[al] Prot[ection] Clause protected class.' "

challenges," and that a lawyer or judge who fails to obtain the requisite number of CLE or CJE hours each year could be subject to disciplinary action by the State Bar. In fact, the MAR court noted that the Capital Case Law Handbook, published by the UNC School of Government, "includes a list of cases that identify appropriate race-neutral reasons to exercise peremptory challenges," and that a UNC School of Government handout from a 2017 CJE seminar entitled Capital Case Management for Superior Court Judges "contains a list of race-neutral reasons for exercising peremptory challenges as well as accurate and correct statements of law on this subject." We agree with the MAR court that "when any attorney or judge attends a CLE or CJE seminar on a particular legal subject, it is expected that accurate and correct statements of the law on a particular subject will be given to the attendee," and that mere knowledge of the state of the law under *Batson* does not raise any inference of discriminatory intent.

Further, acknowledging defendant's admission that "there are good reasons to strike almost anyone from jury service," the MAR court determined that "the [CLE] handout sets forth reasons that are race-neutral and are therefore 'good reasons' to exercise peremptory challenges . . . in a particular case."

The MAR court further concluded that "by an exercise of reasonable diligence," defendant could have obtained the CLE handout through a public records request to the entity that provided the continuing legal education, the North Carolina

Conference of District Attorneys. Accordingly, the MAR court concluded that the CLE handout was "not newly discovered, and [d]efendant's claim to the contrary is meritless."

As the MAR court correctly observed, trial preparation requires that attorneys understand a host of legal issues, including reasons why an attorney may and may not strike a juror. The CLE handout simply displayed legally permissible reasons for exercising peremptory challenges. It defies logic and common sense that an educational tool from a CLE sanctioned by the State Bar would be sufficient to establish a prima facie showing of purposeful discrimination at step one when the material merely contains an accurate rendering of the law.

Taking defendant's argument to its logical conclusion, a prima facie showing of purposeful discrimination could be shown simply by alleging that an attorney researched the law on *Batson*, or that he or she had a section in a trial notebook on defenses to *Batson* objections. Defendant's assertion that the CLE handout is evidence of racial animus on behalf of the State is meritless at best.

Defendant further argues that because he presented evidence that "his prosecutors used the [CLE] handout not only in his case, but in at least two others," *State v. Lyons*, 343 N.C. 1 (1996) and *State v. White*, 131 N.C. App. 734 (1998), the CLE handout constitutes newly discovered evidence of a pattern of racial discrimination. This argument fails not only for the reasons set forth above, but also

because our appellate courts have held that the trial courts in those cases properly denied the defendants' *Batson* challenges. *See Lyons*, 343 N.C. at 14; *White*, 131 N.C. App. at 741. "[O]nce an appellate court has ruled on a question, that decision becomes the law of the case and governs both in subsequent proceedings in a trial court and on subsequent appeal." *Weston v. Carolina Medicorp, Inc.*, 113 N.C. App. 415, 417 (1994) (citing *Transp., Inc. v. Strick Corp.*, 286 N.C. 235 (1974)).

Defendant essentially asked the MAR court to overrule both the trial courts involved in these cases and the appellate courts that affirmed *Batson* denials. Correctly noting that no Superior Court judge has the authority to overrule either the trial courts which denied those defendants' *Batson* challenges or the appellate courts that affirmed those denials, the MAR court properly rejected this request.

The MAR court's findings of fact are supported by competent evidence and further support the conclusion of law that defendant cannot show good cause based on the CLE handout. Because defendant could have conducted legal research and arrived at a proper understanding of the legally recognized justifications set forth in the CLE handout on his own "through the exercise of reasonable diligence in time to present the claim on a previous State or federal postconviction review," we hold that defendant has failed to demonstrate good cause pursuant to subsection 15A-1419(b)(1). Defendant's meritless argument regarding the CLE handout does not provide relief from the mandatory procedural bar.

It is worth noting here that the CLE handout is readily distinguishable from the discriminatory manual at issue in *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231 (2005). In that case, the Supreme Court of the United States addressed, among other issues associated with the claims, a "specific policy of systematically excluding blacks from juries." 545 U.S. at 263. The district attorney's office there had adopted a manual entitled "Jury Selection in a Criminal Case" which detailed "the reasoning for excluding minorities from jury service" and which placed explicit "emphasis on race." *Id.* at 264, 266. Specifically, the manual advised prosecutors that minorities frequently empathize with defendants. *See id.* at 306 (Thomas, J., dissenting). The Court ultimately determined that "when the evidence on the issues raised is viewed *cumulatively* its direction is too powerful to conclude anything but discrimination." *Miller-El II*, 545 U.S. at 265 (emphasis added).

In reaching its conclusion, the Court considered the surrounding circumstances, which included the following: (1) the strikes of 10 of 11 black prospective jurors—one of whom was "ideal;" (2) the fact that prosecutors marked the race of each juror on their juror cards; (3) the explanations given by prosecutors, which did not hold up and were at odds with the evidence; (4) the jury shuffles of the State; (5) the disparate questioning of black and white jurors; and (6) the use of the manual which sought to exclude minorities from the jury. *Id.* at 265–66.

Here, the CLE handout does not include or establish evidence of an intent to

exclude minorities from juries. The CLE handout merely contained accurate statements of legally permissible reasons to exercise peremptory challenges, not a prosecutorial training manual advocating race-based strikes. The CLE handout here is not only not newly discovered evidence under subsection 15A-1419(c); it is not "evidence" that raises an inference of impermissible race-based peremptory challenges at step one. We therefore agree with the MAR court that defendant "suffered no prejudice from failing to have" the CLE handout because "even if [d]efendant had the [CLE] handout . . . there would not have been a different result" at step one.

### b. *Jury Selection Study*

Defendant contends that the MSU study was previously unavailable evidence that shows the prosecutor violated *Batson*. Again, however, the lack of a full *Batson* hearing in the trial court has narrowed the scope of our review, and the issue is whether this study constitutes newly discovered evidence that provides a "reasonable probability" of a different result at step one. As previously noted, to qualify as newly discovered evidence sufficient to overcome the mandatory procedural bar, the MSU study must contain "a factual predicate that could not have been discovered through the exercise of reasonable diligence in time to present the claim on a previous State or federal postconviction review." N.C.G.S. § 15A-1419(c)(3).

As an initial matter, the MAR court "reviewed and considered" the MSU study

and found that it "was created for [d]efendant in preparation to file a previous MAR, specifically [d]efendant's 2010 RJA MAR." The authors' admission that the purpose of the study was to "evaluate the potential for statistical evidence to support claims under . . . the RJA," Grosso & O'Brien, *A Stubborn Legacy* at 1533, and defendant's statement in his reply brief in support of his 2018 MAR that the study "was conducted in preparation for filings under the Racial Justice Act," support the MAR court's finding that the MSU study was created to assist capital defendants, including this defendant, preparing to file under the RJA.

The MAR court noted that the study took less than one year to create, which is borne out by the affidavit of Professors Catherine Gross and Barbara O'Brien who noted that "[w]e began data collection for the study in the fall of 2009 and completed it in the spring of 2010." The MAR court found that "nothing prevented [d]efendant from preparing a substantially similar study or analysis to use on direct appeal or in one of his prior MARs covering the years immediately preceding his direct appeal or prior MARs." Further, the MAR court correctly concluded that the study was "not newly discovered" but "newly created."

We agree with the MAR court that allowing defendant to label such a study as "newly discovered evidence" sufficient to overcome a procedural bar would effectively allow defendant to "manufacture[ ] a mechanism to file an infinite number of MARs." Indeed, historical information concerning juror strikes in other cases, to the extent it

may be relevant at step one, was readily obtainable by defendant.[12]  Mere review of

relevant files or transcripts of capital proceedings in preparation for trial could have

yielded for defendant the same or similar data utilized in the MSU study.  Put

another way, defendant's attorney, investigator, or someone acting at their direction

could have reviewed the Clerk of Court's files from capital murder trials in Forsyth

County and compiled the information defendant now contends is newly discovered.

That gathering such information may have been difficult or time consuming does not

change its character.  The data was in existence and could "have been discovered

through the exercise of reasonable diligence in time to present the claim on a previous

State or federal postconviction review," N.C.G.S. § 15A-1419(c)(3), and in time to

present at trial.  Counsel for defendant certainly understood that *Batson* issues might

arise in a capital trial—and defendant's various postconviction counsel certainly

knew *Batson* objections were made at trial.

Further, defendant argues that peremptory strike data from cases tried

subsequent to his conviction may be considered retrospectively as evidence

establishing a prima facie case of purposeful discrimination.  We reject this argument

because such data has no bearing on defendant's *Batson* claim.  While a defendant is

---

[12] The State correctly notes that while historical evidence and statistical information may be relevant evidence at step one, the issue here "is not relevance or admissibility, but is solely the question of whether such a study constitutes newly discovered evidence allowing for overcoming the procedural bar."

certainly entitled to bring the trial court's attention to a number of relevant factors when attempting to establish a prima facie case at step one, including historical evidence, *see Hobbs*, 374 N.C. at 350, an appellate court's consideration of facts not yet in existence at the time of the trial court's step one ruling would pervert our well-established standard that such a ruling "is accorded deference on review and will not be disturbed unless it is clearly erroneous." *Campbell*, 384 N.C. at 131–32 (quoting *State v. Augustine*, 359 N.C. 709, 715 (2005)); *see also Alston*, 307 N.C. at 341 ("An appellate court is not required to, and should not, assume error by the trial judge when none appears on the record before the appellate court" (quoting *State v. Williams*, 274 N.C. 328, 333 (1968))). A trial court's lack of precognition cannot render its step one ruling clearly erroneous, and in this context, evidence from future cases which did not exist at the time of a trial court's step one ruling cannot establish actual prejudice.

Further, even if the prospective data in the MSU study could have some bearing on our analysis, and even if the historical data in the MSU study could not have been discovered through the exercise of reasonable diligence, the MAR court correctly concluded that this study could not afford defendant relief because the study was unreliable and fatally flawed. The MAR court reached this determination after it examined each of the Forsyth County cases used in the MSU study and found that the study inaptly imputed racial motives to peremptory strikes for cases in which

*Batson* arguments had not been made or *Batson* violations had not been found. In other words, the MSU study assumed racial animus in cases in which defendants did not make any such claim, or in which the trial court or appellate courts did not make or sustain any such findings.

The MAR court discussed the following cases included in the MSU study: (1) *State v. Hooks*;[13] (2) *State v. Larry*;[14] (3) *State v. Little*;[15] (4) *State v. Moore*;[16] (5) *State v. White*;[17] (6) *State v. Moseley*;[18] (7) *State v. Murrell*;[19] (8) *State v. Thibodeaux*;[20] (9) *State v. Frogge*;[21] (10) *State v. Moses*;[22] and (11) *State v. Woods*.[23]

Specifically, regarding *State v. Larry* and *State v. Hooks*, cases in which *Batson* challenges were denied by the trial courts and not raised on appeal, the MAR court found

> the MSU [s]tudy has no authority to overrule the *Hooks* and *Larry* trial courts that specifically found there were no Batson violations. . . . [T]he part of the MSU study that relies on the *Hooks* and *Larry* cases as evidence that race was a significant factor in exercising peremptory

---

[13] *State v. Hooks*, 353 N.C. 629 (2001).
[14] *State v. Larry*, 345 N.C. 497 (1997).
[15] This case remained pending at the time of the MAR court's order.
[16] *State v. Moore*, 335 N.C. 567 (1994).
[17] *State v. White*, 355 N.C. 696 (2002).
[18] *State v. Moseley*, 336 N.C. 710 (1994).
[19] *State v. Murrell*, 362 N.C. 375 (2008).
[20] *State v. Thibodeaux*, 352 N.C. 570 (2000), *cert. denied*, 531 U.S. 1155 (2001).
[21] *State v. Frogge*, 345 N.C. 614 (1997).
[22] *State v. Moses*, 350 N.C. 741 (1999).
[23] *State v. Woods*, 345 N.C. 294 (1997).

challenges and therefore are also evidence of a *Batson* violation in the instant case is materially contradicted by the unambiguous record, unreliable, fatally flawed and meritless . . . .

Next, the MAR Court addressed the examination of *State v. Little* in the MSU study and determined that although that case remains pending, the defendant in *Little* was tried and convicted more than 10 years after defendant in the instant case was tried and convicted—many years after Mr. Lang had left the Forsyth County District Attorney's Office. The MAR court reasoned that

> other than a similar job title, job description and the same employer, the MSU study fails to show any "demonstrable nexus between" the act of the prosecutor allegedly using race as a basis to exercise peremptory challenges in the *Little* case and Rob Lang nor any "causal connection between the conduct [of the other prosecutor's alleged bad act] and the injury [of Rob Lang exercising peremptory challenges in the instant case]" to show that Rob Lang allegedly violated *Batson* in the instant case.

(Alterations in original.)

Ultimately, the MAR court concluded that even though *Little* was a Forsyth County case, "it is so remote in time to the *Tucker* trial that absent said nexus or causal connection, there is no meaningful probative value." In addition, the MAR court determined that defendant could not rely on the *Little* case to show a *Batson* violation in the instant case because "the part of the MSU [s]tudy that relies on *Little* as evidence that race was a significant factor in peremptory challenges . . . is materially contradicted by the unambiguous record, unreliable and fatally flawed."

The remaining cases used in the MSU study—*Moore*, *White*, *Moseley*, *Murrell*, *Thibodeaux*, *Frogge*, *Moses*, and *Woods*—involve defendants *who did not raise a* Batson *issue on appeal*. Thus, the MAR court correctly concluded that the "MSU [s]tudy has no authority to raise a *Batson* claim on behalf of the [r]emaining [d]efendants that failed to do so in their respective cases" and it "has no authority to overrule any of [the] appellate courts ultimately finding no error" in these cases.

The MAR court expressed that the MSU study's reliance on these cases was legally problematic "because [as] trial courts never had the opportunity to make a *Batson* ruling, not only is the three step *Batson* inquiry . . . meaningless, but the standard of review that deference be given to the rulings of the trial courts obviously does not apply"; thus, "by ignoring and effectively bypassing the caselaw" the MSU study essentially "allows [d]efendant to create his own standard of review."

As succinctly put by the MAR court, the use of cases

> (1) where trial courts have already specifically ruled there were no *Batson* violations, which rulings were never appealed to a higher court or otherwise reversed by a higher court, or (2) where no *Batson* claim was ever raised at the trial level to begin with, in a statistical analysis like the MSU [s]tudy as credible evidence of a *Batson* violation in the instant cases is misleading and manipulative.

We agree with the MAR court that the MSU study is fundamentally flawed and lacks relevance because it purports to establish purposeful racial discrimination in jury selection by utilizing cases in which *Batson* arguments were not made, *Batson*

violations were not found, and/or appellate courts determined that *Batson* violations did not exist. As such, the study has no probative value. The use of the MSU study as evidence of racial animus where courts have neither weighed in nor found *Batson* violations by the State is at best a manipulation of data, and at worst, an attempt to use misleading statistics to circumvent established rules of appellate review in the courts of this State.

Among its many fatal flaws, the MSU study suffers from a lack of relevance and causation which cannot be ignored. The connection between the data utilized in the MSU study and the prosecutor's voir dire in the instant case is attenuated at best. Defendant cites the MSU study and argues that because black jurors were struck in prior Forsyth County capital trials, "race was the deciding factor" in the treatment of black jurors in defendant's case.

But researchers armed with information have great power and discretion. Interpretation of data may often be more art than science, and conclusions may often prove to be misleading. Biases and preconceptions can distort objective truths, and the maxim that "statistics don't lie, but statisticians do" should run through the mind of every discerning attorney and judge. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2345 (2021) (describing how the "use of statistics" can be "highly misleading" and how "a distorted picture" can be created by "statistical manipulation"). A healthy skepticism ensures that one is not misled by conclusions

that do not reflect reality. The reality here is that the MSU study used data to proclaim racial disparities when *Batson* violations were not alleged or found. As previously noted, the law of a case is the province of the courts and may not be altered by agreement of the parties or academic interpretation of data.

Fundamentally, defendant seeks to use "evidence" of other purported wrongs to show that the prosecutor acted in conformity therewith in the present case. However, it is not the prosecutor's own alleged prior wrongs that defendant seeks to show, but rather the alleged prior wrongs of North Carolina prosecutors at large. At a bare minimum, our law requires some nexus with the alleged wrongful act, and no demonstrable nexus is present here.

The MAR court observed that the MSU study "identifies alleged bad acts during jury selection of prosecutors working in different offices across North Carolina . . . and imputes these bad acts during jury selection to the prosecutor in the instant case." Further, the MAR court emphasized that "[n]o prosecutors are . . . identified by name" in the study. Defendant's argument amounts to a contention that because two professors from Michigan State issued a study asserting that North Carolina prosecutors struck black jurors at higher rates than other jurors in certain cases, race must have been a deciding factor in selecting jurors in these cases—regardless of prior rulings to the contrary. Therefore, according to defendant, because Mr. Lang is a prosecutor in North Carolina, he must have used race as a deciding factor in

selecting the jury in defendant's trial here. This attenuated "connection" is wholly insufficient to establish purposeful discrimination in the selection of jurors in defendant's case.

As is of ultimate importance here, the ability to obtain similar data and create a similar study was within the control of defendant or his counsel. Good cause can only be shown when the claim cannot be made due to circumstances outside defendant's control—in other words, what cannot be accomplished "through the exercise of reasonable diligence in time to present the claim." N.C.G.S. § 15A-1419(c). Because obtaining then existing data and creating such a study could have been achieved with reasonable diligence, the MAR court correctly concluded that the MSU study is "newly created" not newly discovered evidence. Thus, defendant cannot overcome the procedural bar of section 15A-1419.

We also share the MAR court's concerns that allowing this "newly created" evidence or clever statistical manipulation to be treated as "newly discovered" allows a defendant to manufacture all manner of studies to continue to seek review of his conviction. This directly contradicts one of the purposes of our post-conviction review—finality. *See* N.C.G.S. § 15A-1415, Official Commentary (2021).

Defendant contends that this concern is "a fiction" because he is "indigent and incarcerated." However, those factors did not preclude appointed counsel from petitioning courts for necessary funds to assist in his defense and did not inhibit the

production of the MSU study here. As defendant notes, the MSU study was "undertaken in order to evaluate the potential for statistical evidence to support claims under . . . the RJA." Grosso & O'Brien, *A Stubborn Legacy* at 1533. Thus, every time an academic takes an interest in the law of our State or the case of a particular defendant, or class of defendants, additional post-conviction studies could be generated.

Moreover, "a deliberate, tactical decision not to pursue a particular claim" until a third-party has interpreted already available evidence in a manner most favorable to the defendant "is the very antithesis of the kind of circumstance that would warrant excusing a defendant's failure to adhere to a State's legitimate rules for the fair and orderly disposition of its criminal cases." *Murray*, 477 U.S. at 534. Here, the raw data used to construct the study could have been discovered by defendant's exercise of reasonable diligence. To the extent that the MSU study analyzed and presented previously existing data in a manner that defendant now believes is more persuasive for his claim, it fails to qualify as newly discovered evidence. The "factual predicate" contemplated by section 15A-1419(c) is either available or unavailable to a defendant—it is not a matter of creative packaging.

Finally, we note that this case is not the first instance in which this Court has addressed this study. *See State v. Robinson*, 368 N.C. 596 (2015) (remanding to the trial court to grant the State a continuance to adequately respond to the defendant's

submission of the study in support of his RJA MAR); *see also State v. Richardson*, 385 N.C. 101, 192–201 (2023) (affirming the trial court's exclusion of the MSU study as evidence supporting the defendant's burden at step one of *Batson*, after the State objected to its admission and the prosecutor characterized "it as 'one of the most ridiculous studies [he had] seen in [his] entire life'" (alterations in original)). Neither case involved the circumstances here—a defendant submitting the study as "newly discovered evidence" of a *Batson* violation in a non-RJA MRA—and neither case impacts our rejection of the study here.

Defendant's argument is unrelated to actual innocence and would permit review ad infinitum with the only potential limitation being the imagination and ingenuity of clever attorneys. Such an interpretation of our post-conviction statutes runs counter to the express intent of the legislature. We decline to adopt a rule which would encourage contrived means of overcoming a procedural bar which could ultimately bog down our criminal justice system in a cycle of unending post-conviction review.

Accordingly, we agree with the MAR court and hold that because of the many flaws in the MSU study and its lack of relevance to defendant's argument, it cannot establish evidence of purposeful discrimination in the case at bar, and it does not constitute newly discovered evidence sufficient to overcome the procedural bar.

*c. Case Law*

Good cause may also be established as "[t]he result of the recognition of a new federal or state right which is retroactively applicable." N.C.G.S. § 15A-1419(c). Defendant contends that he was not in an adequate position raise his *Batson* claim earlier "because at the time of his direct appeal and original post-conviction proceedings, North Carolina law imposed an impossibly high bar on *Batson* claimants."

Specifically, defendant argues that until *State v. Waring*, 364 N.C. 443 (2010), North Carolina used the "sole factor" test, requiring *Batson* claimants to prove that racial discrimination in jury selection was the sole factor in a particular strike. In making this argument, defendant points us to *State v. Davis*, 325 N.C. 607 (1989), *State v. Wright*, 189 N.C. App. 346 (2008), and *State v. White*, 131 N.C. App. 734 (1998).

The MAR court addressed defendant's contention that there has been a change in the law of North Carolina regarding *Batson*, specifically, a shift from a requirement that race be a "sole" factor to a requirement that race be only a "substantial" factor. The MAR court determined that "[r]egardless of which standard applies" nothing prevented defendant from making his *Batson* claim on direct appeal or in his prior MARs. In the alternative, the MAR court found that defendant's failure to raise a *Batson* issue on direct appeal constituted error on his part which precludes him from claiming prejudice now. Defendant's argument fails for the reasons stated by the

MAR court and because defendant's claim does not bear out in our precedent. *Waring* did not change the law in this State—it merely reaffirmed it.

In *Waring*, the defendant argued that the trial court had applied the wrong legal standard by stating that the "defendant failed to show that the State's challenge was 'based solely on the fact that she was an African-American female.' " 364 N.C. at 480. This Court declared that the proper test was whether race was a significant factor in a peremptory challenge. *Id.* The trial court had also expressed that the defendant needed to show that the State's challenge of a juror was "*motivated* by discriminatory purposes." *Id.* at 480. The Court went on to hold that "the trial judge applied the correct legal standard," as the trial court's statements demonstrated that it applied the correct standard but misspoke in using the word "solely" at one point. *Id.* at 480–81. In that case, this Court did not announce a new standard; it upheld the same one that had been, and still remains, the law. Therefore, there is no new state right available to defendant which is sufficient to overcome the procedural bar of section 15A-1419.

In *State v. Hobbs*, this Court detailed the *Batson* analysis, citing with approval to this Court's decision in *State v. Quick*, 341 N.C. 141 (1995), while also noting that any suggestion that race be the "sole" reason for striking a juror is incorrect and that the proper inquiry is whether "race was significant in determining who was challenged and who was not." *Hobbs*, 374 N.C. at 352, n.2 (quoting *Waring*, 364 N.C.

at 480).

Defendant uses *State v. Davis*, 325 N.C. 607, 617 (1989), as an example demonstrating a prior standard used in *Batson* cases. To do so, defendant amplifies the word "solely," which appears in the opinion exactly one time. *Id.* at 617. That case did not turn on whether race must be the sole or substantial factor in exercising a peremptory challenge to violate *Batson*. Rather, *Davis* was resolved with a straightforward *Batson* analysis where this Court considered whether "[t]he relevant facts and circumstances in the record . . . establish[ed] a prima facie case of racial discrimination against black citizens during jury selection." *Id.* at 620. This Court concluded that a prima facie case of discrimination had not been established. *Id.* While this Court did use the word "sole" in that case, we nevertheless correctly applied the law as it has been and remains to this day under *Batson*—race as a significant factor.

Defendant's reliance on *State v. Wright*, 189 N.C. App. 346 (2008*), writ denied, rev. denied*, 667 S.E.2d 280 (2008), suffers from the same defect as his reliance on *Davis*. In *Wright*, the Court of Appeals addressed "whether the trial court erred by finding the State had not engaged in purposeful discrimination when the State did not provide a race-neutral explanation for each African-American whom it had removed from the jury by peremptory challenge." *Id.* at 346–47. This case addressed the State's failure to provide race-neutral reasons for its strikes, and the word "solely"

appeared exactly one time in language quoted from the trial court which the Court of Appeals never substantively addressed. *Id.* at 350. Accordingly, this case does not support defendant's contention that our State courts employed a different *Batson* standard that recently changed with *Waring*.

However, *State v. White*, 131 N.C. App. 734 (1998), lends some support to defendant's argument. In that case, the Court of Appeals undoubtedly applied a "sole" factor analysis to the *Batson* inquiry, finding that "[w]hile race was certainly a factor in the prosecutor's reasons for challenging" the prospective jurors, the challenge was not "solely" based on race and thus did not contravene *Batson*. *Id.* at 740. To the extent *White* departed from this Court's precedent, it is an anomaly that pales in comparison to the overwhelming weight of this Court's *Batson* jurisprudence. Our precedent makes clear that the test is and has been whether race is a significant factor, as we restated in *Waring* and *Hobbs*. Therefore, defendant has failed to show a new state right that is retroactively applicable to him. There has been no new standard announced to conjure up a new right for defendant, and neither the trial court nor the MAR court followed an incorrect standard of requiring that race be the sole reason for the strike.

For the reasons stated herein, defendant has failed to establish good cause, as he has failed to establish the recognition of a new federal or state right which is retroactively applicable, and he has failed to show that he has "newly discovered"

evidence that could not have been discovered through the exercise of reasonable diligence in time to present the claim previously. N.C.G.S. § 15A-1419(c).

### 2. Prejudice

Even if defendant had established good cause, he must also demonstrate actual prejudice to overcome the procedural bar. N.C.G.S. § 15A-1419(b). "[A]ctual prejudice may only be shown if the defendant establishes by a preponderance of the evidence that an error during the trial or sentencing worked to the defendant's actual and substantial disadvantage, raising a reasonable probability, viewing the record as a whole, that a different result would have occurred but for the error." N.C.G.S. § 15A-1419(d). Defendant has failed to carry his burden.

At the outset, we reiterate that there is no error, as we hold that defendant failed to show that either the CLE handout or the MSU study qualify as newly discovered evidence sufficient to overcome a procedural bar, so there cannot be actual prejudice. However, even so, we conclude that defendant cannot show "that a different result would have occurred" with the CLE handout or the MSU study.

Regarding the CLE handout, defendant references the transcripts of jury selection alongside the handout to argue that "[t]he prosecutors' use of the cheat sheet in [defendant]'s trial demonstrates that the State violated *Batson*. Use of this document is evidence of pretext and thus evidence of purposeful discrimination." Here, as we have previously noted, we are concerned with the trial court's

determination at step one of the *Batson* inquiry. Defendant's argument, however, goes to steps two and three of a *Batson* inquiry—the prosecutor's reasons justifying the peremptory strikes and whether they show pretext and purposeful discrimination. There is no reasonable probability that the trial court would have reached a different step one determination had defendant possessed the CLE handout at trial.

In addition, defendant cannot show that a different result would have occurred with a comparative analysis across different cases like the MSU study. The Supreme Court of the United States has recognized that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). Such is the case here. As stated above, the study is flawed in many respects and lacks relevance to defendant's case such that any attempted comparative use is improper.

While historical evidence of purposeful discrimination in jury selection within a jurisdiction may be relevant, that is not the nature of the evidence proffered by defendant here. Generally, to show discrimination, a defendant may present any of the following:

> • statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the

case;

· side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

· a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

· relevant history of the State's peremptory strikes in past cases; or

· other relevant circumstances that bear upon the issue of racial discrimination.

*Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) (first citing *Foster v. Chatman*, 136 S. Ct. 1737 (2016); then citing *Snyder*, 552 U.S. 472; then citing *Miller-El II*, 545 U.S. 231; and then citing *Batson*, 476 U.S. 79).

In *Flowers*, the Supreme Court of the United States looked to a history of discriminatory strikes by the prosecutor in Flowers' multiple prior trials. *Id.* at 2245. This involved an analysis of the same prosecutor and same defendant; not an analysis of different cases and different prosecutors as we have here.

There may be instances where discrimination in peremptory strikes in other cases are potentially relevant. *See Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 345 (2003); *Flowers*, 139 S. Ct. at 2243. In *Miller-El I*, the Supreme Court of the United States considered statistics of disparate questioning along racial lines of potential jurors. 537 U.S. at 345. However, in that case, the comparison was based on another case with the "precise line of disparate questioning" by one of "the same

prosecutors who tried" the case before the Court, where the Texas Court of Criminal Appeals had found a *Batson* violation. *Id.* The U.S. Supreme Court also considered "historical evidence of racial discrimination by the District Attorney's Office." *Id.* at 346. This evidence included a history where assistant district attorneys "received formal training in excluding minorities from juries." *Id.* at 347.

The present case is readily distinguishable. Here, discrimination was not found by a court in the other cases used in the MSU study, and in many cases *Batson* objections were never raised by the respective defendants. Again, this study seeks to circumvent the authority of the courts to evaluate *Batson* claims and potentially have superior court judges overrule prior determinations by their colleagues. This is plainly impermissible. *See State v. Woolridge*, 357 N.C. 544, 549 (2003) (explaining that "no appeal lies from one Superior Court judge to another; that one Superior Court judge may not correct another's errors of law; and that ordinarily one judge may not modify, overrule, or change the judgment of another Superior Court judge previously made in the same action" (cleaned up)). Moreover, the superior court does not have the authority to overrule or disregard decisions of this Court or the Court of Appeals.

Further, there has been no indication in the record that the prosecutors in this case or in the State or county were "trained" to exclude minorities or in any way were operating under a policy which sought to exclude minorities. Defendant's argument

amounts to a contention that the MSU study conclusively establishes a prima facie case of purposeful discrimination any time the State uses a peremptory challenge against any prospective black juror. This argument is plainly contrary to law, and there is no reasonable probability that the trial court would have reached a different step one determination if defendant possessed the MSU study at trial.

### 3. *Fundamental Miscarriage of Justice*

"A defendant raising a claim of newly discovered evidence of factual innocence or ineligibility for the death penalty . . . may only show a fundamental miscarriage of justice by proving by clear and convincing evidence that, in light of the new evidence, if credible, no reasonable juror would have found the defendant guilty beyond a reasonable doubt or eligible for the death penalty." N.C.G.S. § 15A-1419(e). Under this exception to the procedural bar, a fundamental miscarriage of justice occurs if a defendant shows new, credible evidence demonstrates that he or she would not have been found guilty or eligible for the death penalty. The plain language of the statute requires an assertion of factual innocence by defendant,[24] or an allegation that

---

[24] Under federal law, the miscarriage of justice exception to a federal procedural bar is interpreted as an "actual innocence" exception. *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992) (addressing a federal law procedural bar of federal habeas review and describing the miscarriage of justice exception as an "actual innocence" exception). In discussing the path to successfully allege that a fundamental miscarriage of justice exception applies, the Supreme Court of the United States has opined that where a constitutional violation is alleged, it must reflect on the defendant's innocence of the crime or show an insufficient basis for a death sentence in order to overcome a procedural bar. *Schlup v. Delo*, 513 U.S. 298, 316

defendant is ineligible for the death penalty. Defendant here alleges neither.

Thus, the procedural bar of section 15A-1419 applies and defendant has not satisfied an exception to the same. Accordingly, the MAR court properly concluded that defendant's *Batson* claim was procedurally barred.

### 4. *State v. Burke*

Defendant also urges this Court to hold that our decision in *State v. Burke*, 374 N.C. 617 (2020), forecloses application of the procedural bar in the present case. The MAR court held that *Burke* does not prevent a procedural bar in this case because *Burke* applied specifically to RJA MARs, and "all of [d]efendant's RJA MARs are still pending and are beyond the scope of this Order."

In *Burke*, we addressed the defendant's MARs pursuant to the North Carolina Racial Justice Act, S.L. 2009-464, § 1, 2009 N.C. Sess. Laws 1213, 1215 (codified at N.C.G.S. § 15A-2012(b) (repealed 2012)). 374 N.C. at 619. Reversing the trial court, we held that "[t]he alleged procedural bars are negated by the language of the RJA" and that "the trial court abused its discretion by summarily denying the claims." *Id.*

---

(1995) ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. However, if a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.").

at 619 (first citing North Carolina Racial Justice Act § 1, 2009 N.C. Sess. Laws at 1215; and then citing *State v. McHone*, 348 N.C. 254, 258 (1998)). Pursuant to the RJA, this Court looked at the evidence presented by the defendant "that race was a significant factor in jury selection, sentencing, and capital charging decisions in the relevant jurisdictions at the time of [the defendant's] trial and sentencing" and determined that "[i]n light of the evidence and arguments presented by defendant, the trial court's denial of his claims without a hearing was an abuse of discretion." *Id.* at 619–20.

To find the entitlement to an evidentiary hearing, this Court looked specifically to the statutory provisions of the Racial Justice Act. *Id.* at 619. The defendant's MARs there were styled as an RJA MAR and an amendment to the RJA MAR, and this Court considered both under the RJA. *Id.* Thus, our holding in *Burke* was plainly limited to the RJA context.

Here, defendant has filed numerous post-conviction motions. The MAR court's order at issue here was expressly limited to the 2017 MAR, the 2019 MAR, and the 2020 MAR based on alleged newly discovered evidence. Defendant's RJA MARs, however, were assigned to another superior court judge. The 2010 RJA MAR and its supplemental filings remain pending in the Superior Court division and were not addressed by the court below. Thus, this Court's review is limited to the MARs addressed by the MAR court. The MAR court correctly concluded that the MARs at

issue here are not RJA MARs like those in *Burke*, and the present case is not controlled by this Court's decision in *Burke*. As such, defendant's argument that *Burke* allows him to overcome the procedural bar under section 15A-1419 is without merit.

Further, the RJA specifically addressed the relief available to defendants sentenced to death.

> If the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed, the court shall order that a death sentence not be sought, or that the death sentence imposed by the judgment shall be vacated and the defendant *resentenced to life imprisonment without the possibility of parole*.

North Carolina Racial Justice Act § 1, 2009 N.C. Sess. Laws at 1214 (emphasis added).

Resentencing is not the remedy defendant requests here. Instead, defendant seeks to have his conviction vacated and a new trial ordered—the appropriate remedy for a violation of *Batson*. Thus, it is plainly apparent that the claim advanced by defendant and addressed by the MAR court below was not an RJA claim.

## IV. Conclusion

Because defendant was in a position to adequately raise his *Batson* claim in his prior appeal and previous post-conviction proceeding and failed to do so,

defendant's MAR is procedurally barred under section 15A-1419. Defendant has failed to establish that he qualifies for a statutory exception to the mandatory procedural bar, and his argument that *Burke* is applicable to the present case is unavailing. The order of the MAR court is affirmed.

AFFIRMED.

Justice RIGGS did not participate in the consideration or decision of this case.

Justice EARLS dissenting.

In 1996, Mr. Tucker, who is African American, was tried capitally, convicted of first-degree murder, and sentenced to death by an all-white jury. While the case before us turns on the applicability of N.C.G.S. § 15A-1419(a)(1) and (3)'s procedural bar, this Court's holding ultimately determines whether a trial court may reach the merits of Mr. Tucker's *Batson v. Kentucky* claim and review the serious allegations Mr. Tucker makes regarding the jury selection procedures in his case. *See* 476 U.S. 79 (1986). Namely that prosecutors Lang and Spence relied on a *Batson* "cheat sheet" to provide pretextual race-neutral reasons for the peremptory strikes that removed all qualified African American venire members from Mr. Tucker's jury. Because I believe that Mr. Tucker's motion for appropriate relief (MAR) is not barred pursuant to N.C.G.S. § 15A-1419(a)(1) and (3) and thus, should go forward, I dissent.

The MAR at issue was filed on 31 October 2017 and amended twice, once in 2019 and again in 2020. To make his *Batson* claim, Mr. Tucker relied on two new pieces of evidence: (1) a handout included in Mr. Tucker's prosecutorial file titled "Batson Justifications: Articulating Juror Negatives" (Batson Justifications Handout); and (2) a statistical study conducted by Michigan State University College of Law (MSU Study), which analyzed juror strike patterns in North Carolina from 1990 to 2010. Neither piece of evidence was available to Mr. Tucker during his direct appeal or a previous MAR filing. In the 2019 amendment to his MAR, Mr. Tucker

also raised the change to our State's *Batson* standard as a reason for his newly filed *Batson* claim. This new standard was adopted in *State v. Waring*, which was decided in 2010. 364 N.C. 443 (2010). Accordingly, this development in our *Batson* caselaw was not available to Mr. Tucker at the time of his direct appeal or a prior MAR filing.

While it is true that N.C.G.S. § 15A-1419(a)(1) and (3) bar a claim that could have been raised on direct appeal or during an earlier MAR but was not, this statute only applies to claims where the defendant was in a "position to adequately raise" the claim in those previous filings. Because Mr. Tucker did not have access to the Batson Justifications Handout or the MSU Study and because the change to North Carolina's *Batson* standard had not occurred at the time of his direct appeal or prior MAR filing, he was not in a "position to adequately raise" his *Batson* claim on direct appeal or in an earlier MAR. Thus, I do not believe his *Batson* claim is subject to section 15A-1419(a)(1) and (3)'s procedural bar.

## I.   *Batson v. Kentucky* and Race-Based Discrimination in Jury Selection

Both the North Carolina and United States Constitutions prohibit the use of race-based peremptory strikes. *Batson*, 476 U.S. 79; *State v. Locklear*, 349 N.C. 118, 136 (1998). While *Batson* is the seminal case regarding the use of racially-discriminatory peremptory challenges, prior to that decision, the United States Supreme Court had been attempting to eradicate race-based discrimination in jury selection for over a hundred years. In 1879, the United States Supreme Court invalidated statutes that excluded African Americans from serving as jurors because

those statutes violated the Equal Protection Clause. *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879). Despite this effort, racial discrimination in jury selection continued through the use of laws that appeared racially neutral on their face but as applied, barred African Americans from serving on juries. For example, North Carolina instituted "laws requiring that jurors: (1) had paid taxes the preceding year; (2) were of good moral character; and (3) possessed sufficient intelligence." *State v. Robinson*, 375 N.C. 173, 177 (2020) (citing *State v. Peoples*, 131 N.C. 784, 788 (1902)).

Moreover, while *Batson* articulated a standard by which to determine race-based jury selection, it did not put an end to this type of discrimination, and following *Batson*, some prosecutors were trained on ways to circumvent *Batson*'s requirements. For example, in Pennsylvania, these methods were taught via a recorded training session by a Philadelphia assistant district attorney, *see* Brief for Digenova et al. as Amicus Curiae Supporting Petitioner at 6, *Foster v. Chatman*, 136 S. Ct. 1737 (2016) (No. 14-8349), while in Dallas, Texas, these tactics were taught through the use of a training manual. *See Miller-El v. Cockrell*, 537 U.S. 322, 334 (2003) (discussing a training manual, which evidenced a "formal policy to exclude minorities from jury service"). Ultimately, these training tools, like the Batson Justifications Handout at issue in Mr. Tucker's case were used by prosecutors to "deceive judges" as to the prosecution's "true motivations" for striking a juror. Brief for Digenova et al. as Amicus Curiae Supporting Petitioner at 8, *Foster*, 136 S. Ct. 1737 (No. 14-8349).

In *Batson*, the United States Supreme Court laid out a three-step process for

evaluating whether a prosecutor's use of peremptory challenges violated the Equal

Protection Clause. 476 U.S. at 96–98.

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358–59 (1991) (citing *Batson*, 476 U.S. at 96–

98). *Batson*'s first step is satisfied if the defendant submits "evidence sufficient to

permit the trial judge to draw an inference that discrimination occurred." *State v.*

*Hobbs*, 374 N.C. 345, 350 (2020) (quoting *Johnson v. California*, 545 U.S. 162, 170

(2005)). The prima facie showing at step one "is not intended to be a high hurdle," *Id.*

(quoting *Waring*, 364 N.C. at 478), and so long "as a defendant provides evidence from

which the court can infer a discriminatory purpose" a defendant will have met the

prima facie standard, *id.* Importantly, and as this Court stated in *Hobbs*, at this step

"the burden on the defendant . . . is one of production, not of persuasion," and "the

defendant is not required to persuade the court conclusively that discrimination has

occurred." *Id.* at 351.

To make this showing, "a defendant may rely on all relevant circumstances,"

*Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (cleaned up), including historical

evidence of discrimination in a jurisdiction. *See, e.g., Miller-El*, 537 U.S. at 346; *see*

*also Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019). In addition, our caselaw has

identified a non-exhaustive list of factors that must also be considered at step 1, those are:

> the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*Hobbs*, 374 N.C. at 350 (quoting *State v. Quick*, 341 N.C. 141, 145 (1995)).

If the required prima facie showing is met, then "the analysis proceeds to the second step where the State is required to provide race-neutral reasons for its use of a peremptory challenge." *Id.* at 352 (citing *Flowers*, 139 S. Ct. at 2243). If the reasons provided are race-neutral on their face, then the Court proceeds to *Batson's* third and final step. *Id.* at 353. At this step, the defendant is required to show purposeful discrimination. *Waring*, 364 N.C. at 475. Here, the trial court "must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." *Flowers,* 139 S. Ct. at 2244. This inquiry requires the court to determine whether the State's peremptory strikes were "motivated in substantial part by discriminatory intent." *Id.* (quoting *Foster*, 136 S. Ct. at 1754).

## II.   Batson Justifications Handout and the MSU Study

### A. Mr. Tucker's Trial

Mr. Tucker was tried for capital murder in Forsyth County in 1996. Robert Lang and David Spence, both of whom were Forsyth County Assistant District Attorneys, prosecuted his case. Jury selection began on 6 February 1996. In 1995, a few months prior to the beginning of jury selection, prosecutor Lang attended a training session for capital prosecutors known as "Top Gun II." Those in attendance were provided with a handout titled "Batson Justifications: Articulating Juror Negatives," which provided prosecutors with a list of reasons to use when defending peremptory strikes of African American jurors pursuant to a *Baston* challenge. The following list of reasons were included in the handout:

1. Inappropriate Dress - attire may show lack of respect for the system, immaturity, or rebelliousness

2. Physical Appearance - tattoos, hair style, disheveled appearance may mean resistance to authority.

3. Age - Young people may lack the experience to avoid being misled or confused by the defense.

4. Attitude - air of defiance, lack of eye contact with Prosecutor, eye contact with defendant or defense attorney.

5. Body Language - arms folded, leaning away from questioner, obvious boredom may show anti-prosecution tendencies.

6. Rehabilitated Jurors, or those who vacillated in answering D.A.'s questions.

7. Juror Responses which are inappropriate, non-

responsive, evasive or monosyllabic may indicate defense inclination.

8. <u>Communication Difficulties</u>, whether because English is a second language, or because juror appeared to have difficulty understanding questions and the process.

9. <u>Unrevealed Criminal History</u> re: voir dire on "previous criminal justice experience."

10. Any other sign of defiance, sympathy with the defendant, or antagonism to the State.

This handout was placed in the prosecution's trial notebook behind a tab titled "jury selection." The bottom of the handout also contains a handwritten note stating "Don't <u>use</u> gender/race reasons in NC may be expanded to othe[r] cognizable Equ. Prot. Clause protected class."

Lang conducted voir dire in Mr. Tucker's case and used peremptory strikes to remove all five qualified African American venire members. Defense counsel objected to all five strikes under *Batson*. After hearing Lang's justifications for each strike, the trial court found there was no purposeful discrimination. However, a comparison of the justifications Lang provided, and the Batson Justifications Handout, suggests that Lang read from the handout when defending his use of peremptory strikes. For example, Lang used the word "inappropriately" on more than one occasion. He also described one prospective juror as "confused" and stated the juror exhibited "monosyllabic" responses. Lang also referred to that same juror as being "very difficult" and having "absolutely horrible [body language]." Lang defended his strikes against one venire member by stating they "did not ever make eye contact with me"

and another by stating he "was untruthful about his criminal record." Based on this information, even the State concedes that "the prosecutors in [Mr. Tucker's] case articulated some justifications similar to the 'Top Gun' training document as part of their rationale for particular juror strikes."

Accordingly, in his most recent MAR, Mr. Tucker argued that the reasons Lang gave for striking prospective jurors were pretextual, for if they had not been, Lang would not have needed to resort to those reasons listed in the handout. *See Snyder v. Louisiana*, 552 U.S. 472, 485 (2008) (stating that when the prosecution's proffer is pretextual, it "gives rise to an inference of discriminatory intent").

**B. Discovery of the Batson Justifications Handout**

After Mr. Tucker's initial trial and prior to the beginning of his post-conviction proceedings, North Carolina passed a law requiring post-conviction discovery in capital cases to include "the complete files of law enforcement and prosecutorial agencies involved in the investigation of the crimes or the prosecution of the defendant." N.C.G.S. § 15A-1415(f) (1997). However, Mr. Tucker's post-conviction counsel stated they never received the Batson Justifications Handout that was part of the prosecution's file. To support this assertion, Mr. Tucker has provided signed affidavits to this effect. Accordingly, no *Batson* claim was raised on direct appeal, in Mr. Tucker's initial MAR, or in any subsequent amendments to that MAR.

On 2 September 2010, Mr. Tucker filed a MAR pursuant to the North Carolina Racial Justice Act (RJA). *See* North Carolina Racial Justice Act, S.L. 2009-464, § 1,

2009 N.C. Sess. Laws 1213, 1214. While no further litigation has taken place in state court on Mr. Tucker's RJA claim, litigation did proceed on another Forsyth County defendant's case, Errol Duke Moses. The discovery granted in Mr. Moses's case included the prosecution's files in many Forsyth County cases, including Mr. Tucker's. On 14 December 2015, Mr. Tucker's current counsel was appointed. Shortly thereafter, counsel for Mr. Moses provided Mr. Tucker's attorneys with portions of Mr. Tucker's prosecution files, which were obtained as part of the discovery process in Mr. Moses's case. This was the first time that Mr. Tucker's attorneys were provided with the prosecution's Batson Justifications Handout.  Because this evidence was not discovered until 2015, it was not available to Mr. Tucker during his direct appeal or prior MAR filing.

## C.  Completion of the MSU Study

The results of the MSU Study demonstrated a pattern of discriminatory peremptory strikes in Forsyth County. Namely, the data showed that African American venire members were struck at a rate 2.25 times higher than other venire members. The MSU Study also reviewed four of prosecutor Spence's Forsyth County cases, and based on those findings, Mr. Tucker alleges that in the aggregate, Spence had struck 62% of African American prospective jurors but only 20% of white prospective jurors. This constituted a strike ratio of 3 to 1, which was significantly higher than the average for Forsyth County or North Carolina state capital cases. The data also showed that only one of Spence's trials had more than one African

American juror, and two of his cases, including Mr. Tucker's had all-white juries.

This study did not begin until 2009, and data collection was not completed until 2010. Furthermore, the research article detailing the study's findings was not published until 2012. Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina Capital Trials*, 97 Iowa L. Rev. 1531 (2012) (hereinafter "Race in Jury Selection"). Accordingly, Mr. Tucker did not have access to this evidence at the time of his direct appeal or at the time he filed a prior MAR.

### III.    MAR Court's Order

In June 2020, Judge R. Stuart Albright denied Mr. Tucker's *Batson* claim, stating that the Batson Justifications Handout and the MSU Study could not be used to support a *Batson* claim because they were not evidence of racial discrimination. Moreover, Judge Albright concluded that Mr. Tucker's claim was procedurally barred pursuant to N.C.G.S. § 15A-1419 because Mr. Tucker had been in a "position to adequately raise" his *Baston* claim on direct appeal or in a prior MAR but did not. *See* N.C.G.S. § 15A-1419(a)(1), (3) (2021).

### A. Mootness of *Batson's* Prima Facie Case Requirement

In its order denying Mr. Tucker's MAR, the MAR court determined that the prima facie case requirement pursuant to *Batson* had not been met and thus the court's analysis was limited to *Batson's* first step. This was legal error.

In *Hernandez v. New York*, the United States Supreme Court relied on principles used in the employment discrimination context and explained that "where

- 80 -

the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." 500 U.S. at 359 (cleaned up). In doing so, the Court unambiguously noted that this "same principle applies under *Batson.*" *Id.* Thus, once a prosecutor has provided the trial court with a race-neutral explanation "for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Id.*

Our Court has affirmed this principle on numerous occasions, beginning in 1991 with *State v. Thomas*, 329 N.C. 423 (1991). *See also Waring*, 364 N.C. at 478; *State v. Bell*, 359 N.C. 1, 12 (2004); *State v. Williams*, 355 N.C. 501, 550–51 (2002); *Hobbs*, 374 N.C. at 354; *State v. Robinson*, 330 N.C. 1, 17 (1991). And there is good reason for this. "Imagine, for example, that when ordered to provide . . . race-neutral reasons for [their] peremptory challenges, [a] prosecutor . . . [states] . . . that [they] struck one of the jurors because of [their] race." *State v. Campbell*, 384 N.C. 126, 141 (2023) (Earls, J., dissenting). It would be absurd, "in light of this blatant racial discrimination," to say that a trial court is not obligated to review this statement for purposeful discrimination pursuant to *Batson's* third step simply because the defendant failed to make a prima facie showing of racial discrimination. *Id.* Thus, when a prosecutor provides what they purport to be race-neutral reasons for the use of a peremptory challenge, a trial court must be required to consider whether those

statements establish purposeful discrimination.

While the majority attempts to distinguish two of the cases which reaffirm this long-standing principle, there are two problems with this approach. First, in matters pertaining to the United States Constitution, our Court may not grant North Carolinians fewer protections than the federal Constitution provides. *Arizona v. Evans*, 514 U.S. 1, 8 (1995). By determining that a prima facie showing is not moot, despite the prosecution having offered race-neutral reasons for the use of peremptory strikes and the trial court having ruled on the use of those strikes, this Court has effectively removed a portion of a criminal defendant's protections arising under the federal Equal Protection Clause. *See Hernandez*, 500 U.S. at 358–59. Moreover, a closer look at both *Robinson* and *Hobbs* exposes the inadequacies of the majority's argument. Namely, that Mr. Tucker's case is more similar to *Robinson* and *Hobbs* than it is different.

In *Robinson*, the defendant objected to peremptory challenges used to remove a black juror, and each time the State voluntarily provided a reason for each of its challenges. 330 N.C. at 16. On appeal, our Court determined that because the State had voluntarily provided explanations for each peremptory challenge, there was no need for this Court to determine whether the prima facie standard had been met. *Id.* at 17. Instead, we "proceed[ed] . . . as if the prima facie case had been established." *Id.* In Mr. Tucker's case, the MAR court's order reflects the voluntary nature of the prosecution's proffered reasons for each peremptory strike. At no time was the

prosecution ordered to provide reasons for its peremptory strikes, instead the court "g[ave] counsel for the State the *opportunity* to be heard." (Emphasis added.)

Furthermore, in *Hobbs*, our Court noted that "[w]here the State has provided reasons for its peremptory challenges, thus moving to *Batson*'s second step, and the trial court has ruled [on these reasons], completing *Batson*'s third step, the question of whether a defendant has initially established a prima facie case of discrimination becomes moot." 374 N.C. at 354. Thus, while the majority attempts to distinguish *Hobbs* from Mr. Tucker's case based on the presence of a "full hearing," *Hobbs* does not stand for the proposition that mootness only occurs when a full hearing is present. Instead, *Hobbs* stands for exactly what it says: in cases where the State has provided reasons for the use of its peremptory strikes and the trial court has ruled on these reasons, the reviewing court should proceed as if a prima facie case has already been established. *Id.* Accordingly, because the prosecution in Mr. Tucker's case provided reasons for the use of their peremptory challenges and the trial court ruled on these reasons, this Court should proceed as if a prima facie case has been established. *See Robinson*, 330 N.C. at 17.

The majority's discussion of a 2020 report by the North Carolina Task Force for Racial Equity in Criminal Justice is irrelevant when considered in light of our precedent in *Robinson* and *Hobbs*. *See Robinson*, 330 N.C. at 17; *Hobbs*, 374 N.C. at 354. Moreover, this case does not turn on whether *Batson*'s first step is moot. The question of mootness only speaks to whether a reviewing court can proceed to step

three of *Batson* and determine whether purposeful discrimination is present. *See Hernandez*, 500 U.S. at 358–59 (citing *Batson*, 476 U.S. at 96–98); *see also Hobbs*, 374 N.C. at 354. Importantly, the question of mootness does not render evidence of racial discrimination irrelevant or cause it to disappear. Instead, if a prima facie case is not moot, the reviewing court is required to determine whether *Batson*'s first step has been met, and if so, it must remand to the trial court for further consideration.

As noted above, *Batson*'s prima facie case requirement mandates that a defendant provide "relevant circumstances [that] raise an inference that the prosecutor used" their peremptory challenges to exclude jurors on "account of their race." *Batson*, 476 U.S. at 96. A prima facie showing is not a high bar, *Hobbs*, 374 N.C. at 350, and as will be discussed in more detail below, the Batson Justifications Handout, along with the MSU Study, "raise an inference" that the prosecution's peremptory challenges were based on race, *see Batson,* 476 U.S. at 96. This is especially true when these new pieces of evidence are reviewed alongside the prosecution's strike pattern in Mr. Tucker's case, which resulted in all five qualified African American venire members being removed from the jury. *See Flowers*, 139 S. Ct. at 2243 (stating that "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case" can be used to support a claim of racial discrimination).

**B. Batson Justifications Handout and the MSU Study as Evidence of Racial Discrimination**

*1. The Batson Justifications Handout*

The MAR court equated the Batson Justifications Handout to "accurate and correct" statements of law. This finding came even though the handout does not contain any reference to case names or case citations. However, the MAR court's benign characterization of the Batson Justifications Handout ignores the controlling legal standard under *Batson*, America's history of race-based discrimination in jury selection, and the focus of Mr. Tucker's *Batson* claim.

Mr. Tucker does not argue that the reasons provided for striking black jurors in his case could not have been permissible in other cases. Instead, he only argues they were not permissible in his case. Under *Batson*, what matters is whether the reasons given by the prosecutor are the true reasons for the strike. *See Hernandez*, 500 U.S. at 365 ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."). This is determined by the facts and circumstances of each particular case and not by whether our Court or the United States Supreme Court has determined those reasons were not pretextual in other cases. *Id.* Indeed, "[a]ny prosecutor can easily assert facially neutral reasons for striking a juror," *Batson*, 476 U.S. at 106 (Marshall, J., concurring), and it is this premise that Mr. Tucker's *Batson* claim addresses.

Namely, Mr. Tucker claims that the Batson Justifications Handout was used

as a sort of "cheat sheet"[1] to simulate race-neutral reasons for striking African American jurors, when in fact those reasons were pretextual. Thus, the Batson Justifications Handout is an important piece of substantive evidence supporting Mr. Tucker's *Batson* claim. *See Miller-El*, 545 U.S. at 266 (finding a *Batson* violation where the prosecutor's training materials advocated for racially based-strikes).

Additionally, America has a long history of excluding African Americans from jury service. *See Pena-Rodrigez v. Colorado*, 137 S. Ct. 855, 867 (2017) ("In the years before and after the ratification of the Fourteenth Amendment, it became clear that racial discrimination in the jury system posed a particular threat both to the promise of the Amendment and to the integrity of the jury trial."). The Batson Justifications Handout cannot be divorced from its historical context, and characteristics like those included in the handout have previously been used to exclude African Americans from juries. In recognition of this issue, Washington State has instituted General Rule 37, which pertains to jury selection, and states that "allegations that [a] prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor; or provided unintelligent or confused answers" have "historically been associated with improper discrimination in jury selection." Wash. Gen. R. 37(i). Thus, "[i]f any party intends to offer one of these reasons or a similar reason as justification for a peremptory challenge," the

---

[1] *See State v. Augustine*, 375 N.C. 376, 382 (2020) (quoting the trial court's order describing the prosecution's use of a "cheat sheet" to respond to *Batson* objections).

court must be given "reasonable notice" such that the juror's behavior can be verified. *Id.* If the juror's purported behavior is not verified, then the reason given for the peremptory challenge will be invalidated. *Id.* Indeed, as the United States Supreme Court explained, while defendants are harmed when the right to a jury trial is compromised by racial discrimination, "racial minorities are harmed more generally, for prosecutors drawing racial lines in picking juries establish 'state-sponsored group stereotypes rooted in, and reflexive of, historical prejudice.' " *Miller-El*, 545 U.S. at 237–38 (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994)).

Moreover, in *Strauder v. West Virginia*, 100 U.S. 303 (1879), the United States Supreme Court overturned a state statute that restricted jury service to whites. Yet, during the Jim Crow era, local officials circumvented the intended effect of this holding by imposing vague requirements for jury service, such as intelligence, experience, and good moral character. *See Norris v. Alabama*, 294 U.S. 587 (1935). As applied, these requirements precluded African Americans from serving on juries. In *Norris*, the Court invalidated one of those laws after a jury commissioner testified that no African Americans had ever served on a jury in that county because:

> [he did] not know of any [African American person] in
> Morgan County . . . who is generally reputed to be honest
> and intelligent and who is esteemed in the community for
> his integrity, good character and sound judgment, who is
> not an habitual drunkard, who isn't afflicted with a
> permanent disease or physical weakness which would
> render him unfit to discharge the duties of a juror, and who
> can read English, and who has never been convicted of a
> crime involving moral turpitude.

*Id.* at 598–99. The Court found it "impossible to accept such a sweeping characterization" and reversed the conviction at issue. *Id.* at 599. Today, the exclusion of African Americans from juries may be less overt, but there remains the "practical difficulty of ferreting out discrimination in selections discretionary by nature, and choices subject to myriad of legitimate influences." *Miller-El*, 545 U.S. at 238. Mr. Tucker's case exemplifies the difficulty of making this determination.

A prosecutor's "outright prevarication" is not the only relevant consideration in jury discrimination cases and sometimes "[a] prosecutor's own conscious or unconscious racism" may play a role in the prosecution's proffered reasons for striking a juror. *Batson*, 476 U.S. at 106 (Marshall, J., concurring). As relevant here, racism whether conscious or unconscious can lead a prosecutor "easily to the conclusion that a prospective black juror is 'sullen' or 'distant,' a characterization that would not have come to mind if a white juror had acted identically." *Id.* This concern is undoubtedly elevated in cases where a prosecutor is accused of relying on a preprinted list of acceptable strike reasons rather than providing the trial court with the true reason for their peremptory strike. The contents of the Batson Justifications Handout illustrate this notion.

Accordingly, United States Supreme Court precedent, as well as our Court's own precedent, allow a defendant to "rely on all relevant circumstances" to support their claims for racial discrimination. *Flowers*, 139 S. Ct. at 2245 (cleaned up); *see also Hobbs*, 374 N.C. at 356 ("A defendant may rely on all relevant circumstances to

support a claim of racial discrimination in jury selection." (cleaned up)). However, the benign classification the MAR court assigned the Batson Justifications Handout ignores this mandate. Specifically, it shows that the MAR court failed to consider all the relevant circumstances Mr. Tucker raised to support his claim of racial discrimination, namely the history of African American jury exclusion and its relationship to the creation of the Batson Justifications Handout contained in the prosecution's trial notebook. Thus, the MAR court's finding that the Batson Justifications Handout was not evidence of racial discrimination was erroneous. Indeed, an analysis of prosecutor Lang's proffered reasons for striking three prospective jurors at Mr. Tucker's trial, Thomas Smalls, Wayne Mills, and Debra Banner, supports that he relied on the Batson Justifications Handout when providing the trial court with reasons for his strikes.

### a. Thomas Smalls

Mr. Smalls was one of the black venire members prosecutor Lang struck during jury selection. At the time of Mr. Tucker's trial, Mr. Smalls was sixty years old, employed, married, and had been living in Forsyth County for forty years. He also had an adult son that was a police detective in South Carolina. When asked about his views on the death penalty, Mr. Smalls stated that he "believe[d] in capital punishment."

Lang's reasons for striking Mr. Smalls mirrored the Batson Justifications Handout. Lang stated, "Your Honor, with regard to Mr. Smalls, juror number three,

we felt we had appropriate justification. Number one, his body language and number two, his responses which were inappropriate." Lang's responses appear to have been taken verbatim from the handout. Lang also noted that Mr. Smalls "did not ever make eye contact with [him]," which is a justification stated in the handout under the heading "attitude."

At one point, Lang also described Mr. Smalls's body language as "absolutely horrible" but failed to explain his rationale for this finding. Lang also characterized Mr. Smalls as "very difficult." This language is similar to that in the handout, which suggested that jurors the prosecution wanted to strike should be characterized as "resistan[t] to authority," having an "air of defiance," or being "non-responsive" and "evasive." Furthermore, while Lang stated that Mr. Smalls had "nodded off" during jury selection, the record does not show the trial court made any determinations regarding Mr. Small's demeanor. *See Snyder*, 522 U.S. at 479 ("Deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike. Here, however the record does not show that the trial judge actually made a determination regarding [the juror's] demeanor." Accordingly, "we cannot presume that the trial judge credited the prosecutor's assertion").[2] Thus, rather than Mr. Smalls having "nodded off," it is more likely that

---

[2] While the majority suggests that *Snyder*, 522 U.S. at 479, stands for the proposition that we are required to defer to the trial court even in cases where that court does not make any findings regarding a juror's demeanor, this assertion is unreasoned. For it is impossible to give deference to a finding that was never made.

Lang's choice of words evince Lang's reliance on the Batson Justifications Handout by echoing the handout's language of "obvious boredom [which] may show anti-prosecution tendencies." This supports that race may have been significant in Lang's decision to challenge Mr. Smalls.[3]

Indeed, Lang's explanations become more "difficult to credit" when Mr. Smalls is compared to white jurors who the prosecution passed despite possessing the same qualities that supposedly made Mr. Smalls an "unattractive juror." *See Foster*, 136 S. Ct. at 1750; *see also Miller-El*, 545 U.S. at 241 ("More powerful than . . . bare statistics . . . are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve."). This is particularly evident in the area of death penalty reservations, which Lang cited as a reason for striking Mr. Smalls. Although it is true that when asked if he could impose the death penalty Mr. Smalls stated, "I guess so," "I don't know," and "I think so," Mr. Smalls also expressed unequivocal

---

[3] Although the trial court repeated prosecutor Lang's assertion, noting that "the district attorney observed that [Mr. Smalls] nodded off to sleep," the trial court did not state that it witnessed Mr. Smalls nod off to sleep, nor did it make a finding of fact to this effect, or state that it agreed with the prosecutor's assessment. Thus, "we cannot presume that the trial judge credited the prosecutor's assertion" regarding Mr. Small's demeanor. *See Snyder*, 552 U.S. at 479. Moreover, even if we were to assume for the sake of argument, that Mr. Smalls did nod off, this does not change the evidence in this case, which suggests Lang relied on the Batson Justifications Handout, a racially discriminatory cheat sheet, when providing reasons for his peremptory strike of Mr. Smalls. Under *Batson*, a constitutional violation occurs when race "was significant in determining who was challenged and who was not." *Miller-El*, 545 U.S. at 252. There is no requirement that race be the sole reason for a peremptory strike. *Id*. Accordingly, based on the record before us, including the evidence supporting Lang's use of the Batson Justifications Handout, it is not a "remarkable feat" to conclude that race may have been "significant" in Lang's decision to challenge Mr. Smalls. *See id*.

support for the death penalty, noting he "believe[d] in capital punishment." Despite this, Lang struck Mr. Smalls while passing white prospective jurors Alan Cubbedge, Robin Dillinger, and Louise Hester, all whose death penalty reservations were stronger and more apparent than Mr. Smalls's.

For example, when asked if he could "be part of a jury of twelve . . . that . . . makes a recommendation of death," Mr. Cubbedge stated he "supposed" so. But when asked if he could be the foreperson who signed the jury sheet and wrote the word "death" on the recommendation sheet, Mr. Cubbedge noted he did not think he "would feel very comfortable with that." Furthermore, when white prospective juror Robin Dillinger was asked about her feelings regarding the death penalty she expressed that she was "not sure if [she was] for it or against it." Similarly, Lang passed white juror Louise Hester, who stated that while she believed in capital punishment, she did not "know if [she] could make that decision for somebody to face that or not." Thus, when Lang's reasons for striking Mr. Smalls are compared to the Batson Justifications Handout and when Mr. Smalls's purported traits are compared to those of white jurors the State passed, it is evident that race may have played a substantial role in Lang's peremptory challenge of Mr. Smalls.

*b. Wayne Mills*

The prosecutors in Mr. Tucker's case also struck black prospective juror Wayne Mills, who at the time of Mr. Tucker's trial had lived in Forsyth County his entire life. Mr. Mills also disclosed that he was married, had a young daughter, and had

held the same job for the preceding seventeen and a half years. The reasons Lang gave for striking Mr. Mills also appear to have been read from the Batson Justifications Handout. Lang expressed that Mr. Mills had used "monosyllabic" responses, had been "smiling inappropriately on a number of occasions," and had "appeared somewhat confused during the questioning."

Not only was the term "monosyllabic" taken directly from the Batson Justifications Handout, it also does not accurately reflect Mr. Mills's behavior. While Mr. Mills gave one-word answers when appropriate, in other circumstances he responded with longer answers. For example, when asked if it was "correct" that his name was Wayne Mills, Mr. Mills responded with "Yes." Yet when asked if he had prior knowledge of Mr. Tucker's case from reading or hearing about the case in the media, Mr. Mills noted, "I very seldom read the newspaper. I'm usually pretty busy at work."

In reference to Lang's assertion that Mr. Mills was smiling inappropriately, the word "inappropriate" appears to have been taken verbatim from the Batson Justifications Handout. What is more, because the trial court's findings are devoid of any suggestion that Mr. Mills engaged in "inappropriate" smiling, we cannot presume the trial court agreed with Lang's assertion. *See Snyder*, 552 U.S. at 479 (providing that deference is only appropriate where the trial court has made a determination concerning a juror's demeanor). Additionally, the only evidence in the record suggesting that Mr. Mills may have been confused is that he asked the trial court to

repeat a lengthy question about capital sentencing instructions. However, asking that one question be repeated is not evidence of confusion, particularly when after having repeated the question, Mr. Mills answered it without issue.

As with prospective juror Smalls, when a side-by-side comparison is conducted of Mr. Mills and white jurors Lang passed, Lang's reasons for striking Mr. Mills appear pretextual. First, the record shows that many white venire members, such as Michael Calcutt, Raymond Marshall, Kelly Richardson, and Lester Hutchins, also responded to Lang's questions with "monosyllabic" or "yes, no" answers. Second, at least two white prospective jurors expressed "confusion" on the record. Namely, after hearing information related to the capital sentencing scheme, prospective juror Don Caldwell asked if he could ask a clarifying question. Moreover, prospective juror Kelly Richardson admitted to being confused regarding her views on the death penalty and expressly stated, "I'm just real confused about that issue."

Lang also noted Mr. Mills not being registered to vote as a reason for striking him. However, several white prospective jurors, such as Lester Hutchins, Raymond Marshall, Winfrey Poindexter, David Porterfield, and Wilma Walker, all of whom were not registered to vote at the time Mr. Tucker's jury selection took place, were passed by the State. Additionally, Lang purported to have struck Mr. Mills, in part, because he "hesitated on death penalty questions." But this assertion is not supported by the record. Namely because the only exchange which could evidence "hesitation" involved Mr. Mills: (1) stating that he believed in the death penalty; (2) asking for

Lang to repeat the following question: "Do you think or have you ever had a personal belief or religious belief in opposition to the death penalty"; and (3) once the question was repeated, unequivocally answering "no." Additionally, as noted above, the prosecution passed many white venire members who expressed uncertainty regarding the death penalty.

Lastly, while Lang stated he also struck Mr. Mills based on his being untruthful about his prior criminal record, Lang passed Wesely Hine, a white prospective juror who had also been untruthful about his criminal record. Despite significant questioning from the prosecution, including being asked whether he had "been to court for any reason," Mr. Hine did not disclose his prior criminal charge. Accordingly, when Lang's proffered reasons are compared with the Batson Justifications Handout, it becomes apparent that he may have relied on it and provided the trial court with pretextual reasons for striking Mr. Mills. Moreover, side-by-side juror comparisons also support that Lang's reason for striking Mr. Mills may have been based on race.

### c. *Debra Banner*

Lang's reasons for striking Ms. Banner also support that his use of peremptory challenges was based on race. At the time of Mr. Tucker's trial, Ms. Banner had lived in Forsyth County all her life, was married, and had children there. She had also been employed at the local hospital for the preceding nine years. Despite this, Lang described Ms. Banner as lacking a stake in the community and cited this as a reason

for striking her.

Moreover, despite having passed many white jurors who were not registered to vote, Lang purported that he struck Ms. Banner for this same reason. Lang also expressed he struck Ms. Banner because she was a health care professional, and "[i]t ha[d] been [his] experience that those who save lives are often hesitant to make a recommendation for death." However, the State passed another medical professional, Brenton Sharpe, who was a pharmacist working exclusively with cancer patients. Mr. Sharpe expressed having direct contact with these patients, and agreed it was his job to "save [his patient's] lives or to make what life they had left as comfortable as possible." In contrast, Ms. Banner was a nursing assistant whose tasks involved feeding patients, turning them, and checking their vital signs. Most of her patients were elderly or had suffered a stroke. Based on Ms. Banner's and Mr. Sharpe's job duties, it stands to reason that if Lang was truly concerned that Ms. Banner's medical work would have made it more difficult for her to recommend a death sentence, he would have also challenged Mr. Sharpe, whose own characterization of his work as saving lives likely provided an even stronger reason to strike. What is more, Lang did not ask Ms. Banner if her work would preclude her from voting for a death sentence. *See Snyder*, 552 U.S. at 481–83 (noting that a prosecutor's justification for striking a juror was "suspicious" where the "prosecution did not choose to question [the juror] more deeply about this matter"). Yet, Lang asked Mr. Sharpe, "Do you think that since you're in that field of medical assistance that it would make it difficult for you

to be on a jury that may end up facing the death penalty . . . as punishment?" *See Flowers*, 139 S. Ct. at 2248 (stating that a prosecutor's "dramatically disparate" questioning of black and white prospective jurors can "supply a clue" for racially discriminatory intent).

Moreover, Ms. Banner's support for the death penalty was stronger than Mr. Sharpe's, and she expressed no doubts or hesitation during Lang's questioning on the topic. In contrast, when asked whether he had any deep moral, religious, or philosophical opposition to the death penalty, Mr. Sharpe noted he felt his "conscience would be at issue. " Lang also claimed that he struck Ms. Banner because she indicated her work schedule posed a hardship to serving on the jury. Yet, at the same time, Lang passed white jurors who also expressed hardship. First, Mr. Cubbedge noted that he ran a jewelry store and was concerned about losing business due to his absence from work. This was especially true given his absence from work had already cost the store "a good bit of business," and he worried that if he were chosen to serve, the store would "lose a good bit of money." He also agreed that his work situation would cause him to "give less than [his] full attention" to Mr. Tucker's trial. Wesley Hine also explicitly stated he did not want to serve on Mr. Tucker's jury, while juror Brooke Burr expressed that her work and childcare situation posed such a hardship that she would only serve if forced to do so. Ms. Burr noted "if I'm forced to stay, I would say I could be fair but it's really a hardship."

Regarding Ms. Banner's expression of hardship, Lang stated he was concerned

that due to working second shift at the hospital, Ms. Banner would not be "awake or aware" and that she would be "worried about work." However, Lang did not appear to share this concern for Mr. Sharpe who admitted to getting poor sleep due to having a baby at home. Similarly, Lang did not seem concerned that Mr. Cubbedge had expressed he would be distracted by work if he was asked to serve.

In *Snyder*, the United States Supreme Court found that the prosecution's purported reliance on a prospective black juror's expression of hardship was pretextual. *Snyder*, 552 U.S. at 482. In doing so, the Court noted that while an expression of hardship might cause a juror to favor a "quick resolution," it did not necessarily dictate how a juror would vote. *Id.* In fact, the desire for a quick resolution could cause a juror to favor the "outcome that other jurors agreed with, which might in many cases, be a favorable outcome for the prosecution." *Id.*

Lastly, while Lang asserted that Ms. Banner fell asleep during voir dire, the trial court made no finding that this occurred. *See id.* at 479. While the record may support that Ms. Banner had been "sleepy," the Batson Justifications Handout that Lang relied on throughout jury selection directs prosecutors to reference a juror's "obvious boredom" as a race-neutral reason for striking them. Thus, taking this information together with Lang's other justifications for striking Ms. Banner shows that race was likely a substantial factor in Ms. Banner's strike.

### 2   *The MSU Study as racial discrimination*

The MSU Study compiled data from capital trials in North Carolina to analyze

whether race played a role in prosecutorial strikes. *Race in Jury Selection at* 1542–47. Based on this study, Mr. Tucker alleges that, in Forsyth County, where his trial took place, Forsyth County prosecutors struck African American venire members 2.25 times more than other prospective jurors. Moreover, the study reviewed four Forsyth County capital trials involving the same prosecutor involved in Mr. Tucker's case, David Spence. According to Mr. Tucker's MAR, that data showed that prosecutor Spence's use of strikes constituted a strike ratio of 3 to 1.

The United States Supreme Court and our Court have stated that trial courts must consider historical evidence of discrimination. Specifically, in *Flowers*, the Court stated that "relevant history of the State's peremptory strikes in past cases" and any "other relevant circumstances that bear upon the issue of discrimination" can, *inter alia*, be used to prove racial discrimination pursuant to *Batson*. 139 S. Ct. at 2243. Our Court reiterated this principle in *Hobbs*, stating that "a court must consider historical evidence of discrimination in a jurisdiction." 374 N.C. at 351.

Despite having the benefit of *Batson* and its progeny before it, the MAR court rejected the MSU Study, determining it could not be evidence of racial discrimination because our courts had not found a *Batson* violation in the cases the study reviewed. The court also criticized the study as "unreliable, fatally flawed and meritless" for the same reason. However, in making its determination, the MAR court placed an impermissibly high burden on Mr. Tucker. Essentially, rather than interpret the study as "relevant history of the State's peremptory strikes" or as evidence of

"relevant circumstances that can bear upon the issue of discrimination," the trial court determined it was invalid simply because its findings contradicted our Court's holdings. The majority makes the same mistake.

But whether a defendant can meet the legal requirements of *Batson* is a separate and distinct question from whether a jurisdiction or a particular prosecutor has a history of disparately using peremptory strikes to remove people of color from the jury. And that evidence of strike patterns from other trials is relevant under *Batson* and *Hobbs*, regardless of whether those defendants could meet *Batson's* legal requirements. *Flowers*, 139 S. Ct. at. 2243 (explaining that "relevant history of the State's peremptory strikes in past cases" can be used to show racial discrimination); *Hobbs*, 374 N.C. at 351("[A] court must consider historical evidence of discrimination in a jurisdiction."). Moreover, under this logic it would be impossible for any defendant to rely on any study detailing the disparate use of peremptory challenges against people of color in North Carolina. Namely, because since *Batson* was decided, our courts have only once found a substantive *Batson* violation. *See State v. Clegg*, 380 N.C. 127, 162 (2022). This stands in stark contrast to every state appellate court located in the Fourth Circuit. Daniel R. Pollitt & Brittany P. Warren, *Thirty Years of Disappointment: North Carolina's Remarkable Appellate Batson Record*, 94 N.C. L. Rev. 1957, 1957, 1961 (2016). Accordingly, it was legal error for the MAR court to disregard the MSU Study and determine it was not evidence of racial discrimination.

## IV.    Procedural Bar Pursuant to N.C.G.S. § 15A-1419(a)(1) and (3)

Without citing any caselaw, the majority asserts that because (1) "the trial court identified the *Batson* issue as a possible issue on appeal and said so in the presence of the parties," and (2) "[d]efendant was on actual notice that a *Batson* claim could be an appellate issue," this means Mr. Tucker was in adequate position to raise his *Batson* claim on direct appeal or a prior MAR.    However, N.C.G.S. § 15A-1419(a)(1) and (3) and our caselaw interpreting that provision do not establish that a defendant who knows that an issue might be relevant on appeal is required to raise it or risk losing that claim forever. Instead, the text of the statute expressly provides that when a defendant "was in a position to adequately raise the ground or issue underlying the present motion [either on direct appeal or in a previous MAR] but did not do so" that MAR is procedurally barred. N.C.G.S. § 15A-1419(a)(1), (3).

Yet our Court has indicated that this is not a general rule, and the correct analysis requires a reviewing court "to determine whether the particular claim could have been brought on direct review [or in a previous MAR]." *State v. Hyman*, 371 N.C. 363, 383 (2018) (quoting *State v. Fair*, 354 N.C. 131, 166 (2001)). This Court has further acknowledged that for a claim to be subject to N.C.G.S. § 15A-1419's procedural default, the record in the case must contain "sufficient information to permit the reviewing court to make all the factual and legal determinations necessary to allow a proper resolution of the claim in question." *Id.* In part, this requires our Court to determine whether the record at trial would have allowed Mr. Tucker to

make a viable *Batson* claim. *Id.* at 384.

Thus, the majority's and the MAR court's conclusion that Mr. Tucker's claim is procedurally barred because he was in a "position to adequately raise" the claim on direct appeal or in a prior MAR contradicts the standard articulated in *Hyman*, which provides that a claim is only subject to N.C.G.S. § 15A-1419's procedural default if the record contains "sufficient information to permit the reviewing court to make all the factual and legal determinations necessary to allow a proper resolution of the claim." 371 N.C. at 383.

## A. Batson Justifications Handout

Prior to the discovery of the Batson Justifications Handout, the record in Mr. Tucker's case, as it pertained to *Batson*, was sparse and only included the jury selection transcript as well as the trial court's ruling following the defense's objections pursuant to *Batson*. However, now, and through the discovery of the Batson Justifications Handout, a reviewing court can make the "factual and legal determinations necessary to allow a proper resolution" of Mr. Tucker's *Batson* claim.

The MAR court determined that prior to trial or before Mr. Tucker's direct appeal, the defense could have obtained prosecutor Lang's continuing legal education record and learned that he had attended the Top Gun II seminar. And thus, according to the MAR court, Mr. Tucker could have raised his *Batson* claim at an earlier time. Additionally, because the MAR court equated the handout's contents to "accurate and correct statements of law" regarding the *Batson* standard, which had been previously

explained by our appellate courts and the United States Supreme Court, it concluded that the contents of this handout were available to Mr. Tucker either on direct appeal or at the time of his previous MAR filing. Namely, the MAR court asserted that to obtain the information contained in the Batson Justifications Handout, Mr. Tucker "by exercise of reasonable diligence, could have conducted legal research," the same way the MAR court had.

However, this reasoning misses the premise of Mr. Tucker's *Baston* claim, which depends not only on Lang attending the Top Gun II training session and receiving the Batson Justifications Handout but also on Lang using this handout to defend his strikes of African American jurors in Mr. Tucker's case. The fact that Lang attended the training does not alone indicate that he relied on the handout while prosecuting Mr. Tucker. However, the handout's presence in the prosecution's trial notebook, along with the transcripts from voir dire, provide Mr. Tucker with a strong argument that the prosecution relied on the handout and provided pretextual reasons for striking jurors in violation of *Batson*. *See Snyder*, 552 U.S. at 485 ("The prosecution's proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent."). Thus, until Mr. Tucker found the handout in the prosecution's file, thereby linking its use to his case, Mr. Tucker was not in a position to adequately raise his *Batson* claim on direct appeal or in a previous MAR.

## B. The MSU Study

The MAR court also found that Mr. Tucker could have presented the MSU

Study during a prior MAR filing, because "[d]efendant, by the exercise of reasonable diligence, could have had a substantially similar study to use in his direct appeal or in one of his prior MARs." To reach this conclusion, the MAR court made several assumptions: (1) that the study was completed for Mr. Tucker; (2) that Mr. Tucker had control over when the study was completed; and (3) that Mr. Tucker had the resources to complete this study or a "substantially similar study" prior to his direct appeal or a previous MAR filing. However, none of these assumptions are supported by the record.

First, the MSU Study was not completed for Mr. Tucker. Instead, in their published law review article, the study's authors explained that the study was "undertaken in order to evaluate the potential for statistical evidence to support claims under . . . the RJA." *Race in Jury Selection* at 1533. Thus, while the evidence contained in this study may be helpful to Mr. Tucker and others seeking to bring *Batson* claims, the MSU Study was not created for Mr. Tucker or any other specific capital defendant. Second, Mr. Tucker did not have control over when the MSU Study was completed. The RJA was passed in 2009, *see* North Carolina Racial Justice Act, S.L. 2009-464, § 1, 2009 N.C. Sess. Laws 1213, 1214, and "prohibited capital punishment if race was a significant factor in the decision to seek or impose the penalty," *Robinson*, 375 N.C. at 176. The authors of the MSU Study clearly stated in the article's introduction that the MSU Study was intended to ascertain whether statistical evidence could support RJA claims, and thus the RJA's passing was at

least in part the inspiration for this study. *Race in Jury Selection* at 1533. Thus, it follows that the earliest the MSU Study could have begun was in 2009 when the RJA was passed. *See* North Carolina Racial Justice Act, S.L. 2009-464, § 1, 2009 N.C. Sess. Laws 1213, 1214.

Additionally, the MSU Study was the result of a joint effort between Michigan State University College of Law and various sources of funding. *Race in Jury Selection* at 1531 n.1. Thus, the willingness of these sources to complete the MSU Study also dictated the MSU Study's timing and completion. Third, because the MSU Study required funding from various sources and Mr. Tucker is incarcerated and indigent it is difficult to understand how Mr. Tucker could have completed this study on his own. Interestingly, absent from the MAR court's order is any discussion on how Mr. Tucker could have raised the money to complete this study on his own, or how Mr. Tucker alone could have completed the statistical analysis necessary for the MSU Study.[4]

Ultimately, the MSU Study was not published until July 2012 and thus was not available to Mr. Tucker during his direct appeal or his previous MAR. *See Race in Jury Selection* at 1531. Accordingly, Mr. Tucker was not in an adequate position to

---

[4] In their affidavit, the MSU Study's authors, Catherine Grosso and Barbara O'Brien, provided an overview of their methodology, which required obtaining and reviewing strike patterns by race in 173 proceedings.

raise his *Batson* claim on either direct appeal or in a prior MAR filing. *See* N.C.G.S. § 15A-1419(a)(1), (3).

## C. Change in Our Court's Interpretation of *Batson*

Lastly, Mr. Tucker's claim is not procedurally barred because under North Carolina law, as it existed prior to 2010, Mr. Tucker's claim would have been subject to an impossibly high standard that most claimants could not meet. Prior to 2010, our law required a showing that race was the "sole" factor for the use of a peremptory strike. *See, e.g., State v. Davis*, 325 N.C. 607, 617 (1989). The difficulty of meeting this standard is illustrated by the Court of Appeals' opinion in *State v. White*, 131 N.C. App. 734 (1998), in which the prosecutor stated in open court that he was striking two African American jurors, in part, because they were "[b]oth black females." *Id.* at 739. Despite this direct evidence of racial discrimination, the Court of Appeals noted that "[w]hile race was certainly a factor in the prosecutor's reasons for challenging [the two jurors]," it could not find that the peremptory strike was solely based on race. *Id.* at 740.

In 2010, in *Waring*, our Court rejected the sole factor test. 364 N.C. 443. In doing so, it explained that "[a]s stated in *Miller-El*, the third step in a *Batson* analysis is the less stringent question whether the defendant has shown 'race was *significant* in determining who was challenged and who was not.' " *Id.* at 480 (quoting *Miller-El*, 545 U.S. at 252). This standard was later reaffirmed in *Hobbs*, where this Court reiterated the standard from *Miller-El* and noted that it was an incorrect statement

of law to suggest "a strike is only impermissible if race is the sole reason." 374 N.C. at 352 n.2. This means that prior to 2010, Mr. Tucker's appellate and post-conviction counsel would have had no choice but to review Mr. Tucker's case under the sole factor test, which would have been difficult, if not impossible, for Mr. Tucker to meet. Thus, until 2010, when this Court provided the correct legal standard under which to bring a *Batson* claim, Mr. Tucker's claim was not viable and he was not in a position to adequately raise his *Batson* claim. *See Hyman*, 371 N.C. at 384; *see also* N.C.G.S. § 15A-1419(a)(1), (3).

## V.    Conclusion

"[R]acial discrimination in jury selection offends the Equal Protection Clause." *Batson*, 476 U.S. at 85 (citing *Strauder*, 100 U.S. 303). When this type of discrimination is present, "defendants are harmed" because their right to a jury trial is compromised. *Miller-El*, 545 U.S. at 238. But as the United States Supreme Court stated over thirty-seven years ago in *Batson*, "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." 476 U.S. at 87. "Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Id.* Moreover, a prosecutor's use of these same racially discriminatory procedures jeopardizes the integrity of our courts. *Miller-El*, 545 U.S. at 238. Thus, it is of paramount importance for both the defendant and our state that our courts reach the merits of a *Batson* claim whenever they have the opportunity to

properly do so.

"In reality, the finding of a *Batson* violation does not amount to an absolutely certain determination that a peremptory strike was the product of racial discrimination." *Clegg*, 380 N.C. at 162. Instead, "the *Batson* process represents our best" perhaps "imperfect[ ] attempt at drawing a line in the sand establishing the level of risk of racial discrimination that we deem acceptable or unacceptable. If a prosecutor provides adequate legitimate race-neutral explanations for a peremptory strike, we deem that risk acceptably low. If not, we deem it unacceptably high." *Id.* In Mr. Tucker's case, the risk is unacceptably high.

Mr. Tucker did not have access to the Batson Justifications Handout or the MSU Study at the time of his direct appeal or his prior MAR filing. Moreover, the change in our caselaw, which provided Mr. Tucker with the opportunity to make a "viable" racial discrimination claim pursuant to *Batson*, did not occur until 2010. *See Hyman*, 371 N.C. at 384. Thus, without the discovery of new evidence and the change to our *Batson* standard, first articulated in *Waring*, Mr. Tucker was not in a "position to adequately raise" a *Batson* claim on direct appeal or during a previous MAR filing. Because of this, N.C.G.S. § 15A-1419(c) and (d) are inapplicable, and Mr. Tucker is not required to show good cause or actual prejudice for his claim to proceed.[5]

---

[5] In reaching the fundamental miscarriage of justice exception to N.C.G.S. § 15A-1419's procedural bar, the majority suggests that if Mr. Tucker were innocent his claims would not be barred. However, a defendant is not required to be innocent to claim *Batson's* protections. Instead, a defendant whether guilty or innocent, must only show that "race was significant in determining [which jurors were] challenged and [which were] not." *Miller-El*,

Accordingly, I would hold Mr. Tucker's claim is not procedurally barred and remand

to the trial court for consideration of the merits of Mr. Tucker's *Baston* claim.

---

545 U.S. at 252; *see also Flowers*, 139 S. Ct. at 2244 ("The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.' ").